[No. S019798. Aug. 17, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER CLARK BOX, Defendant and Appellant.

**COUNSEL**

Alan S. Yockelson and Richard P. Siref, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—A jury found defendant Christopher Clark Box and Manuel Flores, Jr., guilty of the first degree murders of April Gilhousen, her three-year-old son Bryan, and a houseguest, Kevin Chandler (Pen. Code, §§ 187, subd. (a), 189),[1] the attempted premeditated murder of Rodney Almond (§§ 664, 187, subd. (a), 189), first degree robbery (§ 211), conspiracy to commit robbery (§ 182, subd. (a)(1)), and residential burglary (§ 459). The jury also found that defendant and Flores had personally used a deadly weapon in the robbery and burglary, and in the murders of April Gilhousen and Kevin Chandler (§ 12022), and that defendant had personally used a deadly weapon and inflicted great bodily injury in the attempted murder of Almond (§§ 12022, 12022.7). The jury further found true as to defendant the special circumstance allegations of murder during the commission of robbery and burglary, and multiple murder. (§ 190.2, subd. (a)(3), (17)(A), (17)(G).) Defendant was sentenced to death.

The case is before us on defendant's automatic appeal. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.

## I. Facts

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

On August 9, 1989, April Gilhousen, her fiancé, Michael Ross, and their two children, Bryan and Aspen, resided at 4341 Clairemont Mesa Boulevard, San Diego. Also residing temporarily at the house was a friend, Kevin Chandler. Flores lived nearby.

On August 9, 1989, between 6:00 and 6:30 a.m., Ross left for work. At that time, his children and Chandler were sleeping. Bryan was celebrating his third birthday that day. April had purchased a bicycle for him, but assembly was required.

Approximately 3:00 p.m., Randi Renken, a friend of April's, and another woman arrived at the Gilhousen residence. Entering through the unlocked front door, Renken discovered a broken telephone in the living room, a disassembled bicycle in the kitchen, and April's body in her bedroom. She notified authorities.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

April died as a result of blunt head injuries and a stab wound that completely penetrated her heart. Either injury would have been fatal. Her ear was nearly ripped in half, her forehead split open and skull fractured, and a pattern abrasion appeared on her forearm, cheek, and neck. There were defensive injuries on her arm and hand.

Bryan's blanket-wrapped body had been discovered that morning in a carport. He died as a result of asphyxia by strangulation with a contributing factor of blunt head injuries. His collarbone was broken. His face was congested or plethoric. The entire left side of the head was bruised as a result of an impact that crushed the tissues and caused bleeding. He suffered abrasions and bruises about the face, head, upper torso, arms, and legs, and there were numerous small abrasions and bruises around the neck, mouth, and nose.

Kevin Chandler's blanket-wrapped body was also discovered, in a different carport, at approximately 10:45 a.m. on August 9. His skull was crushed and he had a deep incised throat wound that severed his trachea. Either injury would have been fatal. There were no defensive or postmortem injuries.

Four-month-old Aspen was found by a responding firefighter, lying unharmed on the floor by April's bedroom door. Bryan's bedroom window was broken. April's purse and the living room couch, in which drug proceeds were kept, contained no currency. Also missing were a pound of marijuana, a baseball bat, and a butcher knife.

Defendant and Flores had previously visited the Gilhousen residence. On one occasion, Jason De Blasio accompanied defendant to the residence. He waited outside for defendant and entered the residence when he grew impatient. Defendant was sitting with April in the living room. As De Blasio entered the room, the conversation stopped and defendant picked up a plastic baggie containing a white rock-candy-like substance and put it in his pocket.

On another occasion several days before the murders, defendant and Flores visited April together. Randi Renken overheard defendant and April discussing the purchase of a pound of marijuana. April told defendant she had picked up her pot and had obtained a pound for him as well, and that when defendant had the money, all he had to do was come over and get it. April also mentioned she had made $1,200 during the past few days.

On the Sunday before the murders, Flores told Marcus Boykin about a woman across the street who had a pound of marijuana, and that he and

defendant were going to try to make a deal. According to Flores, defendant had been to the house before, had seen the marijuana in a bag, and knew where it was located in the house.

Just before 8:00 a.m. on August 9, Flores's mother was waiting at a bus stop, and saw defendant and Flores drive by in defendant's Chevrolet S-10 Blazer.

Between 8:30 and 8:50 a.m., Rodney Almond (also known as Rodney Nicholson) arrived at the Gilhousen residence. After parking his car in an alley behind the house, Almond approached the open back door. He heard a slamming sound. Flores brushed past Almond. Almond stared at Flores, and then turned to see defendant coming out of the doorway with a baseball bat raised over his head. Defendant swung at Almond's head; Almond blocked the blow with his left arm. Defendant swung again striking Almond's left shoulder. Almond ran out onto the middle of Clairemont Mesa Boulevard with defendant in close pursuit; this chase was witnessed by two passersby. One of these witnesses saw a person whose physical description matched that of defendant return to the Gilhousen residence. This witness also saw a person whose physical description was consistent with Flores wave the person who looked like defendant inside the house.

Almond ran into a Thrifty gas station and took refuge in a back room. He declined offers to call the police, was asked to leave, and obtained a ride from a stranger to his friend Dennis Burns's house.

Shortly after 9:00 a.m., Flores's younger sister Yvonne, accompanied by a friend, encountered Flores outside a nearby Von's store. Flores was driving defendant's Blazer. Brief pleasantries were exchanged.

Michael Schwanbeck, who resided next door to the Gilhousens, came out of his residence on his way to work about 8:50 to 8:55 a.m. Schwanbeck saw two men whose physical descriptions were consistent with that of defendant and Flores outside the Gilhousen residence carrying a rolled up comforter. He was struck by the fact that it required two men to carry "something that looked so light as that." The two men approached a blue Blazer parked behind the Gilhousen residence.

Approximately 9:30 a.m., Randi Renken telephoned April. An unfamiliar male voice answered the telephone and then hung up. Calling back a second time, Renken again spoke with the unidentified male.

About 10:00 a.m., Almond, Burns, and David Samples returned to the alley behind the Gilhousen house to recover Almond's car. Shortly after they

arrived, defendant and Flores appeared. Burns, who was armed with a shotgun, and Almond confronted them. Defendant apologized, and drove with Almond to a nearby 7-Eleven store. While in the car, defendant told Almond there had been an accident and April had been killed. Defendant appeared to have a large sum of money, and gave Almond a $100 bill to pay for an X-ray.

On August 10, 1989, defendant and Flores were apprehended. Police recovered $1,105 from defendant's girlfriend, Jeane Harkleroad. Defendant gave her the money late in the evening on August 9. Sometime between August 9 and the time he was arrested on August 10, defendant told Harkleroad he had a large quantity of marijuana. A search of Flores's bedroom revealed $600 wrapped in a plastic bag hidden beneath the carpet, and another $600 inside a backpack identified as belonging to Flores.

## 2. *Defendant's Evidence*

The defense consisted primarily of character and reputation evidence. According to teachers, coaches, and friends, defendant was a warm, popular person who loved children and was an outstanding athlete. He was also a nonviolent person and generally had a reputation as such.

On August 9, 1989, about 7:30 a.m., Lori Sooy, April's neighbor, heard yelling from the alley area, and the loud voices of adults and children. Approximately 9:00 a.m., Sooy's two small boys pushed open the door of the Gilhousen residence. Sooy pulled the door shut; as she did so she could hear a phone ringing without being answered.

Richard Shaw, chief of the toxicology laboratory at the San Diego County Medical Examiner's Office, testified that the toxicology analysis of Chandler's bodily fluids revealed the presence of alcohol and a relatively high amount of methamphetamine. Chronic use of methamphetamine can cause paranoia. Forensic analysis of defendant's urine sample by a different toxicologist, Norman Pawchuk, revealed a relatively low level of methamphetamine. Flores's blood and urine samples were negative for all drugs tested.

Daniel Rattiner, defendant's fellow student, also knew Almond and Chandler. Almond appeared to be a drug abuser who acted in a nervous, excited manner. Chandler also appeared to have a drug problem. He had a "bad attitude" and used racial epithets. Rattiner had never, however, seen Chandler use a racial epithet to anyone's face.

Several months before the homicides occurred, Rex Romero had a hostile encounter with Chandler. Angry words were exchanged, and a fellow employee separated them before blows were struck.

### 3. *Flores's Evidence*

Flores testified in his own defense and introduced both his prior police statements and those of defendant. While defendant and Flores each gave inconsistent statements, they ultimately both admitted being together at the Gilhousen residence on the morning of the crimes, but attempted to place primary responsibility for the murders and motivation for drugs and money on each other. Their statements were otherwise consistent with the other evidence such as the murder weapons used, the movement of Bryan's and Chandler's bodies, the attack on Almond, and the breaking of Bryan's window.

Flores testified that while Chandler was seated and opening Bryan's bicycle box, defendant attacked Chandler with a bat. Defendant also killed April and Bryan. Flores admitted cutting Chandler's throat and stabbing April after defendant had already injured them. He denied knowing Bryan had been killed until he saw the evening news.

Following defendant's failed pursuit of Almond, defendant and Flores drove around the neighborhood in defendant's Blazer for approximately 10 to 15 minutes looking for Almond. Defendant then returned to the house, and Flores continued driving around by himself for another 15 minutes. It was during this time he encountered his sister Yvonne.

In addition, Flores presented evidence of his good character and reputation. He was described by several witnesses as a nonviolent person who had a reputation for nonviolence. In contrast, defendant had a reputation for being violent.

Dr. Randall Baselt, a clinical and forensic toxicologist, opined that given defendant's August 11, 1989, methamphetamine level, and making certain other assumptions, defendant's methamphetamine level on August 9 was consistent with someone under the influence of that drug. At such a level, objective symptoms include anxiety, nervousness, or an irritable or hostile manner.

Dr. Sheldon Zigelbaum, a psychiatrist who examined Flores, opined that Flores was a follower and responded ineffectively to stress. According to Zigelbaum, if Flores were to witness an unexpected lethal bludgeoning, he would be traumatized, and "become depersonalized and would fall under control of some external source of command that would indicate to him what to do next, because Manny Flores would have no idea what to do next. . . ." Flores's "own decision-making systems were short-circuited,"

and he was "not able to hear the voice of his own conscience" or judgment, "the voice of his own reason." None of Flores's postbludgeoning behavior, such as his failure to seek help from his sister, Almond, or Burns, or otherwise report the incident, his failure to leave the Gilhousen residence when defendant said he could, driving defendant's vehicle alone in search of Almond, or his acceptance of money from defendant, were inconsistent with this opinion.

Zigelbaum's credibility was impeached when it was revealed his license to practice medicine was currently under review by the State of Massachusetts due to allegations of unprofessional conduct. Moreover, Zigelbaum was not board-certified in either psychiatry or forensic psychiatry. In addition, Zigelbaum's curriculum vitae was shown to be substantially misleading to the extent it falsely suggested he was the medical director for a psychotherapy center, when the professional corporation at issue consisted only of himself and his wife; that he was currently on the advisory board for a Vietnam veterans posttraumatic stress program at Rutland Heights Hospital, when that board had not been active since 1987; that he was an active consultant to and expert witness for the Bristol County District Attorney's office, when in fact he had no relationship with that office since approximately 1981; that he was a consultant to the Massachusetts Attorney General's office from 1978-1987, when in fact he had not been an active consultant to that office since approximately 1980; and that he was a current consultant for First Security Services Corporation, when he had not been an active consultant since approximately 1980.

Dr. Donald Viglione, a clinical psychologist, administered a Rorschach test to Flores to determine whether his personality was more consistent with dependent traits or antisocial or psychotic traits. Based on the test results, Viglione opined that Flores had dependent personality traits.

### 4. *Defendant's Rebuttal*

Several witnesses who knew Flores testified in an effort to discredit Zigelbaum's testimony. Some testified Flores was a violent person; others that he had a reputation for violence. He had bragged about participating in a robbery murder or assault in a canyon, stolen a watch and gone through the pockets of a severely inebriated guest at a party, stolen a leather-encased telephone during the same party, stolen a handgun from a home where he had attended a different party, initiated an angry confrontation with a motorist, climbed into and out of a female motorist's car while it was stopped at a red light, and provoked fights.

### 5. *Flores's Rebuttal and Surrebuttal*

Flores denied he had bragged about a robbery murder in a canyon, stolen a gun, phone, or watch, or started any fights. Testimony was presented regarding his nonviolent character.

### 6. *Prosecution Rebuttal*

Detective Raybould testified regarding an untaped statement by defendant. (See *post*, at pp. 1192-1195.) Aaron Rieker, who babysat for April, testified that Bryan knew defendant by name. Thomas Tutrow, Chandler's former next-door neighbor, testified he was a sickly diabetic who was not physically capable of hurting a flea.

### B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution relied on the guilt phase evidence for its penalty phase case-in-chief and offered no further evidence.

### 2. *Defense Evidence*

Scores of family members, friends, classmates, clergy, teachers, and coaches testified that defendant was consistently a compassionate, hard-working, respectful, and nonviolent individual, who loved children. Defendant had excelled athletically in high school, and was disappointed when he did not receive any scholarship offers. Rather than burden his parents with the expense of college, defendant attended San Diego City College with the hope of obtaining a football scholarship from Long Beach State University.

Defendant's family life was warm and stable. His parents had been married approximately 25 years. Both had overcome impoverished backgrounds, and the couple waited to have children until they could adequately provide for them. Defendant's father was a Vietnam War veteran who spent 22 years in the Navy, subsequently earned two associate college degrees, and at times worked two jobs to send defendant to private Catholic school. Defendant and his father enjoyed playing football together. His mother primarily devoted herself to raising defendant and his younger sister. She also provided foster care for several children whom defendant treated as his brothers and sisters. The Box family was described as a good Christian family.

Witnesses described Flores as a robber, a troublemaker, and violent.

## II. DISCUSSION

### A. *Guilt Phase*

#### 1. *Alleged Failure to Allow Sufficient Inquiry of Prospective Jurors*

■ Defendant contends the trial court "severely hampered [defendant's] ability to effectively use voir dire to ensure an unbiased and unprejudiced jury" by prohibiting defendant from conducting sequestered, individual voir dire of those prospective jurors who had, or who had spent time with, small children.[2] Defendant asserts violations of his right to due process and an impartial jury under the federal and state Constitutions, and violation of his federal constitutional right to a reliable death verdict.

During jury selection, defendant requested that the trial court inquire as to the ages of the prospective jurors' grandchildren. The court denied the request, stating, "Whether you're going to be prejudiced by the fact that a young child is involved in this case doesn't turn upon whether you have one at the moment. It turns upon whether your personality and capacities are such as to be able to deal with the wrench that goes with that. No matter how many or how few grandchildren you have got or what age you are. It's something that jurors are going to have to deal with; they're going to have to be able to set aside."

Over defendant's objection below, and contrary to what he argues on appeal, the trial court correctly ruled that the then recently enacted jury selection provisions of Proposition 115, subsequently codified in Code of Civil Procedure section 223,[3] applied to this case. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299-300 [279 Cal.Rptr. 592, 807 P.2d 434] [jury voir dire provisions of Proposition 115 apply to all trials occurring after the proposition's effective date].) Accordingly, the trial court assumed primary

---

[2]Defendant also summarily claims the trial court erred in failing to allow prospective jurors to be questioned "about the killing of the mother of a young baby, drug dealing, and the cross-racial nature of the crimes." In fact, any bias in these areas appears to be adequately addressed by the court's voir dire.

[3]Code of Civil Procedure section 223 provides, "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

responsibility for questioning prospective jurors, and generally performed this task in open court. This included "death qualification," as discussed below. (See *post*, at pp. 1180-1181.) The prospective jurors were instructed at length on the need for candor during voir dire. Sensitive matters were discussed in chambers, and at that point counsel was permitted to inquire.

The trial court made the following inquiry to the first panel of prospective jurors regarding Bryan's death: "[O]ne of the more pathetic things that you're going to see is at least one picture . . . of a little three-year-old boy in his sleepers dead. It's not a picture that's going to make anybody very happy, but you're not here to be made either happy or sorrowful, and you're not here to decide the case on the basis of your emotions in response. The facts are that this little boy ended up dead, and there are factual issues that a jury must decide that arise out of that circumstance. They must be decided on the basis of reason, not any kind of emotion that you feel. Is there anyone who's going to be so upset by that kind of a picture that you can't apply your reason and set aside your emotions? Not telling you you shouldn't have the emotions. I'm telling you you must set them aside and not allow them to cloud your judgment. Is there anybody who feels you can't do that?" "Is there anybody who feels that because the case involves, among other people and things, a three-year-old child, that you are going to be emotionally moved to do something that—other than reason requires?" Shorter but similar inquiries were made to the subsequent panels. Subsequently, several jurors were questioned in chambers regarding their strong emotional reaction to a case involving a small child's murder.

"The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729 [112 S.Ct. 2222, 2230, 119 L.Ed.2d 492].) Pursuant to former Code of Civil Procedure section 223, the question of whether individual, sequestered voir dire should take place is within the trial court's discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 713-714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Such discretion is abused "if the questioning is not reasonably sufficient to test the jury for bias or partiality." (*People v. Chapman* (1993) 15 Cal.App.4th 136, 141 [18 Cal.Rptr.2d 738].)

Here, the trial court acted within its discretion. Its inquiry clearly sought to ascertain from the prospective jurors whether they harbored any improper bias. That the prospective jurors understood the inquiry as such is evidenced by the fact that several did come forward and discuss their strong emotional reaction in chambers. Contrary to defendant's assertion, a prospective juror would not reasonably interpret the trial court's comments to mean a biased response "was expected and therefore not worth mentioning to the judge."

Nor does the fact that some prospective jurors came forward mean that others were too intimidated or embarrassed to do so. Indeed, it is difficult to imagine a prospective juror *not* having a strong emotional reaction to a three-year-old's murder, or feeling shame or embarrassment at revealing in front of others the depth of that reaction. Moreover, the precise parameters of a prospective juror's possibly disqualifying reaction *were* examined in chambers, and counsel was then permitted to inquire.

Defendant also challenges as unconstitutional the trial court's refusal to allow the parties to give the prospective jurors a written questionnaire. The trial court stated a written questionnaire would not adequately provide the necessary explanation needed to understand the questions. The court, however, used the proposed questionnaires in formulating the questions it asked on voir dire, and invited counsel to provide any further questions they wanted the court to consider.

Defendant asserts that the questionnaire would have ascertained whether the prospective jurors had young children or grandchildren and how much contact they had with them, and whether they could be impartial in a case involving a three-year-old victim. The bias these inquiries sought to uncover was adequately addressed in the court's voir dire.

Finally, defendant asserts that the trial court "ordered that jury selection be conducted in less than one week." Not so. The trial court merely predicted the parties would be able to select a jury within that time period.

### 2. *Denial of Hovey Voir Dire*

■ Defendant contends the trial court erred in not performing individualized voir dire concerning prospective jurors' views on capital punishment, in violation of his federal constitutional rights to effective representation, due process, an impartial jury, and a reliable death verdict, citing *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]. We recently held that Proposition 115 abrogated *Hovey*. (*People v. Waidla, supra*, 22 Cal.4th at p. 713.) Defendant suggests no persuasive reason to revisit this conclusion.

Nor did the trial court abuse its discretion in determining that group voir dire regarding death qualification was "practicable" in this case. (Code Civ. Proc., § 223; *People v. Waidla, supra*, 22 Cal.4th at pp. 713-714.) Contrary to defendant's assertion, the trial court expressly stated on numerous occasions it had discretion to order sequestered voir dire if group voir dire was impracticable. In its view, individual voir dire with inquiry by counsel was

appropriate when a juror made an affirmative response to a group inquiry involving a sensitive matter, such as a "death-" or "life-qualifying" question. This approach seems reasonable, and defendant fails to assert any persuasive reason why group voir dire was impractical in this case. (See Code Civ. Proc., § 223.)

Defendant also contends that the format and questions used by the trial court prevented adequate "life-qualifying" inquiry in violation of *Morgan v. Illinois, supra,* 504 U.S. at pages 735-736 [112 S.Ct. at page 2233]. We disagree. Rather, the trial court specifically asked the prospective jurors whether anyone would automatically vote for death on a particular set of findings or on any set of findings.

█ Finally, defendant contends the trial court erred in allowing the prosecution's challenge for cause of Prospective Juror Esther J. While in chambers, Esther J. volunteered, "I couldn't vote for [the] death penalty. I just—it's just something that I have never believed in it. A life, whether it's taken by legal means or otherwise, is just wrong; that's how I feel within me." In response to inquiry by the court, Esther J. stated, "[O]ne thing that I think is so horrible is when a small child is mutilated and killed, but then I think the person who did it must be absolutely insane and they—they should be put away for life without a chance of getting out again, not that this—death, I can't—even for that I can't quite bring myself to feel that that's right." She further stated, "I know that if I did vote for capital punishment, I would live with a sense of guilt for the rest of my life." While Esther J. indicated she would try to follow the law, she also agreed with the prosecutor that it was wrong for the state to execute people "for any circumstance," and that she "could think of no situation where [she] would be able to agree with the death penalty."

█ A prospective juror "may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) "On appeal, if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." (*People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) "If there is no inconsistency, and the only question is whether the prospective juror's responses in fact demonstrated an opposition to or bias in favor of the death penalty, we will

not set aside the court's determination if it is supported by substantial evidence and hence not clearly erroneous." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1047 [60 Cal.Rptr.2d 225, 929 P.2d 544].)

We conclude this prospective juror was properly excused. To the extent Esther J.'s answers were equivocal or conflicting, we are bound by the trial court's determination. To the extent they were not so, substantial evidence supports the trial court's conclusion. Contrary to defendant's assertion, the trial court's rejection of prosecution challenges for cause based on other prospective jurors' views on capital punishment has no bearing on the correctness of the trial court's decision to excuse Esther J.

### 3. Denial of Funding for Jury Selection Expert

Defendant contends voir dire was also improperly limited by the trial court's failure to authorize funding for a jury selection expert. (§ 987.9.)[4] He contends this failure, in combination with the other alleged errors noted above, deprived him of his right to an impartial jury and a reliable penalty determination, violated his rights under the California Constitution and his Sixth and Fourteenth Amendment rights to due process and effective assistance of counsel, and resulted in a fundamentally unfair trial. In particular, defendant contends that by arbitrarily denying defense counsel funding for a jury selection expert, the trial court allowed bias to continue unprobed by not providing counsel the resources to intelligently exercise peremptory and for cause challenges. We disagree.

On August 23, 1990, Defense Counsel Elizabeth Barranco filed a declaration requesting investigative and expert funds, including a request for $9,240 to hire jury selection expert Dr. Wendy Saxon. (§ 987.9.) The declaration stated Saxon had experience in 33 capital cases, and, in particular, "experience in selecting juries in cases involving the capital murder of children," which trial counsel did not.

San Diego County Superior Court apparently uses a panel of trial judges (which of course does not include the assigned trial judge) to review funds

---

[4]Section 987.9, subdivision (a), provides in relevant part: "In the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of . . . experts, and others for the preparation or presentation of the defense. The application for funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. . . . Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. . . . In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant."

requests. At the September 4, 1990, hearing on the request, trial counsel stated Saxon's expertise was particularly necessary because the district attorney's office had a full-time jury selection expert; the court noted this expert "will be gone in two months." One judge expressed the panel's view that "lawyers are trained as well as anyone else to select juries, and there are two lawyers on the case, and their expertise is as great or greater than this person's." Counsel stated Saxon had experience in several capital cases involving murdered children, which counsel did not, "and I think murder of children, from what I read, is one of the most touchy areas with the jury." A judge apparently responded that it was fairly obvious "people don't like people accused of killing children."[5] The judge added that "[o]n the general subject of jury selection experts have been proliferating, not because anyone thought it was necessary, but because we recognize that in a number of cases the District Attorney has had someone there who may or may not have some competence. I think the general attitude for this group of judges is that that's nice but nonessential, and at least a majority and one hung on the issue of [whether] we should continue this." Counsel said, "I know a lot of the cases pending have jury experts, and I feel like we are being shorted . . . because we didn't ask for it earlier." A judge responded, "You have to have a place to start change."

On September 11, 1990, Barranco filed another declaration requesting the court to reconsider its denial of funding for a jury selection expert. The requested amount was reduced to $4,200 because jury selection was now expected to take half the time originally estimated. Counsel stated that contrary to the panel's assumption, defense counsel would not be permitted to ask prospective jurors "any direct questions unless pursuant to a challenge for cause." In addition, she stated there would not be *Hovey* voir dire for every prospective juror. (*Hovey v. Superior Court, supra,* 28 Cal.3d 1.) Moreover, "jury selection will be done without [the] benefit of a jury questionnaire." Defense counsel had no experience selecting a jury under these circumstances, and were thus "all the more needy of a death penalty jury selection expert who, on the basis of her experience and studies, can identify with minimal information those prospective jurors who should be peremptorily challenged."

At the September 18, 1990, hearing on the reconsideration request, the court stated, "I have seriously considered the question of experts on jury selection. They are nice to have. We can't afford giving everybody in this case and every case an expert for jury selection. That's what lawyers are for. They are supposed to be experts. You're going to have a couple. That will do

---

[5] The transcript reads, "It could be argued to figure out people don't like people accused of killing children."

lots of things. If you will study the situation, I am sure in a case of this nature the judge will allow voir dire by [the] lawyer, as the judge has discretion to do. And I see no reason . . . in this case, why it's different from any other case, and you are skilled lawyers. I know [codefense counsel] Mr. Adair is extremely adept and skilled at selecting juries. I have had Mr. Adair appear in front of me on serious cases, and I'm not going to reconsider it." Counsel said, "[O]ur judge has told us he will not allow us to ask any questions." The court responded, "That doesn't alter the situation."

"Section 987.9 commits to the sound discretion of the trial court the determination of the reasonableness of an application for funds for ancillary services" such as a jury selection expert. (*People v. Mattson* (1990) 50 Cal.3d 826, 847 [268 Cal.Rptr. 802, 789 P.2d 983]; see *People v. Alvarez* (1996) 14 Cal.4th 155, 234 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Here, contrary to defendant's assertion, the record reveals the panel did not deny the funds request simply because it "had decided to arbitrarily draw a line in the sand concerning expenses." Nor, by relying on the expertise of these particular attorneys instead of providing funding for a jury selection expert, did the trial panel "virtually ensure[] that jurors with strong biases due to the nature of the case and of the victims remained in the jury pool." Rather, the trial court reasonably concluded a jury selection expert was not reasonably necessary for preparation or presentation of the defense. (See *People v. Mattson, supra,* 50 Cal.3d at p. 847.)

While defense counsel expressed concern that they had no experience in selecting a jury post-Proposition 115, or in a case involving a child's murder, and noted the possibility that the district attorney would use a jury selection expert, none of these circumstances establish a basis for concluding funding was "reasonably necessary." (§ 987.9.) As the trial court stated, "lawyers are trained as well as anyone else to select juries, and there are two lawyers on the case, and their expertise is as great or greater than this person's." Here, counsel was permitted to suggest voir dire questions to the court, and sensitive matters were discussed in chambers, at which point counsel was permitted to inquire. Defendant does not explain how counsel lacked the ability during this process to identify juror bias simply because the case involved a child's murder.

Indeed, in *Mattson,* which involved the brutal kidnapping, sexual assault, and murder of a nine-year-old girl, we also upheld the trial court's refusal to grant funding for a jury selection expert, concluding that none of the factors cited in support of the request established such funds were " 'reasonably necessary.' " (*People v. Mattson, supra,* 50 Cal.3d at pp. 839-840, 847-848.) In so doing, we rejected the claim that reasonable necessity was established

because counsel lacked experience performing *Hovey* voir dire, the "inflammatory nature of the charges increased the difficulty of selecting impartial jurors," "counsel had been economical in other phases of trial preparation," and "the cost of an expert was modest." (*Id.* at p. 847.) We stated the defendant "did not demonstrate how lack of experience in conducting voir dire under the *Hovey* procedure was relevant to his ability to identify prospective jurors who were qualified or were subject to excuse for cause." (*Ibid.*) Moreover, "[n]othing about the charges in this case so distinguishes it from other capital cases or noncapital cases in which sexual assaults are charged as to compel a conclusion that selection of impartial jurors would be unusually difficult." (*Id.* at p. 848.) The same is true here. Thus, this case is unlike *Ake v. Oklahoma* (1985) 470 U.S. 68, 74 [105 S.Ct. 1087, 1091, 84 L.Ed.2d 53], on which defendant relies, and in which the high court held an indigent defendant is entitled to the services of a psychiatrist when he makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial. Unlike psychiatric expertise, the trial panel reasonably concluded a jury selection expert in this case would not offer any expertise not already available to counsel.

### 4. *Alleged Wheeler Error*

Defendant contends the prosecutor impermissibly exercised three of her peremptory challenges to exclude Blacks from the jury in violation of his right to trial by a jury drawn from a representative cross-section of the community, guaranteed by article I, section 16, of the California Constitution and the Sixth Amendment, and his and the prospective jurors' Fourteenth Amendment right to equal protection. The trial court denied the motion. We conclude defendant's claims are without merit.

Following the prosecution's peremptory challenge to Carl H., defense counsel asked that the record reflect Mr. H. was Black, and stated, "For the record, your honor, perhaps I would make the *Wheeler* motion and submit it. I would admit that I think we're on very weak grounds at the present time." The prosecutor stated, "Then I have nothing to respond to," and the matter was not further addressed at that time.

Following the prosecutor's peremptory challenge of Stephen A., defense counsel again made a *Wheeler* motion (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), noting Mr. A. was Black, and that many other Black prospective jurors had been excused for hardship reasons. As a result, only two Black prospective jurors "actually made it into the selection process" to that point, and both had been challenged by the prosecution. The trial court denied the motion, stating, "I don't think that I

can find the preliminary fact on the basis of . . . two peremptories. . . . [A]t this point I can't make the finding of a prima facie showing . . . ." The court nevertheless allowed the prosecutor to state her reasons. She observed that Carl H. worked at a waste treatment plant, where she had "prosecuted a good number of the individuals who work there, in an undercover drug deal," and had information that "most of the individuals working there were high as kites on most days." Mr. H. had also been arrested, and when asked about the arrest "didn't seem to understand diversion and the fact that this was a serious matter," and placed more emphasis on his traffic warrants than his arrest for paraphernalia. Moreover, he had as a result spent three days in the custody of the San Diego police, the department involved in this case, and he was single.

As for Stephen A., the prosecutor stated Mr. A. knew approximately 10 people, including friends and relatives, who had been shot, and that he used the word "shot" instead of "killed," which gave her "a certain impression of that individual's thinking"; one of these people, a relative, had been shot by police. Moreover, he had grown up with a person who later became a football coach at San Diego City College, where defendant had played football. When asked about his recollection of news coverage, he remembered that the defendants were athletes from Clairemont, "whereas everybody else who remembers the news generally remembers that there was a baby killed, that individuals were killed." Mr. A. felt "police had to meet quotas in making arrests . . . [a]nd that the police didn't always have the facts when they bring someone in on, quote, 'technicalities.' " He used the term "*po*lice," emphasizing the first syllable, instead of "police." He had the same distinctive haircut as defendant at the time of his arrest, had "extremely poor grammar," was slow of speech, and was tardy.

The trial court responded, "Well, my reaction is that I don't have to pass on the quality of the challenges," presumably because it had not found a prima facie case. (7)[(See fn. 6.)] The court further stated, "but my curbstone reaction is that the first one is amply justified, and many of the reasons stated for the second one are the type of which the appellate courts have been critical. But, on the other hand, if he weren't Black, nobody . . . if they knew about these reasons would be criticizing counsel for using them."

 Following the prosecution's peremptory challenge to Stephanie W. as an alternate juror, defense counsel renewed their *Wheeler* motion. "We

---

[6]In fact, prospective "[j]urors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias." (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; see *Purkett v. Elem* (1995) 514 U.S. 765, 769 [115 S.Ct. 1769, 1771, 131 L.Ed.2d 834] ["a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection"].)

believe that Miss [W.] is the first in a string, probably, of minorities who are about to be excused." A debate ensued as to whether Stephanie W. was indeed Black; while the court itself had placed a question mark next to her name in its own notes, it declined the prosecution's request to question Ms. W. regarding her ancestry. The court deferred ruling on the motion, but allowed the prosecution to state its reasons for challenging Stephanie W.

Ms. W. had been a victim of a residential burglary; the door was left open and the lights on. She did not report it to the police, which "says something to me." Instead, she sought advice from a firefighter friend, who advised her not to enter the residence. While she did not go in, she sent a neighbor in.

Following the completion of voir dire, the court inquired whether anyone had a *Wheeler* motion. The prosecutor stated, "Yes, your honor. And it is very apparent that defense counsel are choosing the individuals that they care to kick off in a group manner; and by doing so and by already knowing the People's position in regards to the Filipinos and having the blanket kick of Filipinos, this is the third individual kicked." The court inquired, "[W]hat is the defense position as to whether I should grant the *Wheeler* motion as to the Filipinos and discharge this panel and start over?" Defense counsel stated, "Your honor, . . . we feel it's in Mr. Box's best interest to proceed with this particular jury and alternates. And to be . . . intellectually honest in regards to it, it's not my feeling that we discriminated against Filipinos because of their race. . . . We oppose the *Wheeler* motion."

The court denied the motion, and inquired of defense counsel whether they could maintain their deferred *Wheeler* motion in view of the fact that one alternate juror was Black. Defense counsel submitted the motion. It was denied, with the trial court expressly finding the prosecutor had not "engaged in racial discrimination."

 "It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitutions." (*People v. Turner, supra,* 8 Cal.4th at p. 164; *People v. Wheeler, supra,* 22 Cal.3d at pp. 276-277; *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69].) Under *Wheeler* and *Batson,* " '[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the

representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . .' " (*People v. Howard* (1992) 1 Cal.4th 1132, 1153-1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315], italics omitted; *People v. Turner, supra,* 8 Cal.4th at p. 164; *People v. Wheeler, supra,* 22 Cal.3d at pp. 280-281.)[7]

■ "When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire." (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." (*People v. Howard, supra,* 1 Cal.4th at p. 1155, quoting *People v. Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659].)

When a trial court expressly rules that a prima facie case was not made, but allows the prosecutor to state his or her justifications for the record, the issue of whether a prima facie case was made is not moot. (*People v. Davenport, supra,* 11 Cal.4th at p. 1200; *People v. Turner, supra,* 8 Cal.4th at pp. 166-167.) Rather, "when an appellate court is presented with such a record, and concludes that the trial court properly determined that no prima facie case was made, it need not review the adequacy of counsel's justifications for the peremptory challenges." (*People v. Turner, supra,* 8 Cal.4th at p. 167.)

■ Contrary to what defendant claims, substantial evidence supported the trial court's denial of his *Wheeler* claims to the extent such rulings were based on a finding that no prima facie case of discrimination had been made. In particular, defendant failed to establish from all the circumstances of the case a strong likelihood or reasonable inference that Carl H., Stephen A., and Stephanie W. were challenged because of their group association. (*People v. Howard, supra,* 1 Cal.4th at p. 1154.) Rather, the only basis for establishing a prima facie case cited by defense counsel was that the prospective jurors—

---

[7] In *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1195-1197, the Ninth Circuit Court of Appeals observed that *Batson v. Kentucky, supra,* 476 U.S. at page 96 [106 S.Ct. at page 1722], used a "raise an inference" standard instead of saying, as this court did in *People v. Wheeler, supra,* 22 Cal.3d at page 280, that the defendant must show a "strong likelihood." As *Wade* itself recognized, and contrary to *People v. Benard* (1994) 27 Cal.App.4th 458, 465-466 [32 Cal.Rptr.2d 486], in California, a "strong likelihood" means a "reasonable inference." (*Wade v. Terhune, supra,* 202 F.3d at p. 1196 ["*Batson* Court therefore adopted a standard compatible with the *Wheeler* standard . . . ."]; *People v. Wheeler, supra,* 22 Cal.3d at pp. 280-281.) We therefore disapprove *People v. Benard, supra,* 27 Cal.App.4th 458, to the extent it is inconsistent with *People v. Wheeler, supra,* 22 Cal.3d at pages 280-281.

like defendant—were Black. This is insufficient. (*People v. Davenport, supra,* 11 Cal.4th at p. 1201; *People v. Turner, supra,* 8 Cal.4th at p. 167; *People v. Rousseau* (1982) 129 Cal.App.3d 526, 536-537 [179 Cal.Rptr. 892] [defense counsel's statement that " 'there were only two blacks on the whole panel, and they were both challenged by the district attorney' " failed to establish a prima facie case].) Indeed, there was a dispute as to whether Stephanie W. was Black, and a Black juror did serve as an alternate.

Defendant asserts that any failure by the defense to establish a prima facie case of discriminatory peremptory challenges is attributable to the trial court's alleged mishandling of voir dire in general and the *Wheeler* motions in particular, preventing defendant from showing that there were no legitimate nonracial grounds for excusing the prospective jurors. We reject this characterization of the record, and find ample grounds on which to uphold denial of defendant's *Wheeler* motion. The trial judge, who had performed much of and observed the remainder of the voir dire, was in the best position to determine under "all the relevant circumstances" of the case whether there was a strong likelihood or reasonable inference these prospective jurors were being challenged because of their group association. (*People v. Howard, supra,* 1 Cal.4th at p. 1156; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Wheeler, supra,* 22 Cal.3d at pp. 280-281.) The prosecutor engaged in more than "desultory" questioning of Carl H. and Stephen A. (there was no in-chambers questioning by counsel of Stephanie W.). (*People v. Wheeler, supra,* 22 Cal.3d at p. 281.) While the significance of this factor is diminished in the aftermath of Code of Civil Procedure section 223, defendant overlooks the fact that counsel was permitted to question Carl H. and Stephen A., and the trial court conducted voir dire for all three prospective jurors. This record, reviewed independently by the trial court, clearly established specific non-race-related reasons why a prosecutor might want to excuse these prospective jurors, e.g., Mr. H.'s arrest by the San Diego Police Department, Mr. A.'s relative who had been shot by police and his relatively low general opinion of police, and Ms. W.'s reluctance to call the police when her home was burglarized. Furthermore, it is incongruous that defendant was satisfied with the jury's composition when opposing the prosecution's *Wheeler* motion, but immediately became dissatisfied when the court turned to defendant's *Wheeler* motion. Finally, while the trial court's express determination that the prosecutor had not "engaged in racial discrimination," made after discussing the prosecutor's reasons for excusing Stephanie W., is ambiguous as to whether the trial court ever found a prima facie case was established as to this prospective alternate juror, substantial evidence supports the conclusion either that there was no prima facie case established, or that the prosecutor's reasons for excusing her were race-neutral. (See *People v. Mayfield* (1997)

14 Cal.4th 668, 726-727 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Turner, supra,* 8 Cal.4th at pp. 166-168.)

Defendant argues, however, that these and the other bases stated by the prosecutor are insufficient because the prosecutor did not excuse other non-Black jurors who displayed similar characteristics. ■ "However, we have previously rejected a procedure that places an 'undue emphasis on comparisons of the stated reasons for the challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor,' noting that such a comparison is one-sided and that it is not realistic to expect a trial judge to make such detailed comparisons midtrial." (*People v. Turner, supra,* 8 Cal.4th at p. 169, quoting *People v. Johnson, supra,* 47 Cal.3d at p. 1220.) "In addition, we have observed that 'the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge.' " (*Turner, supra,* 8 Cal.4th at p. 169.) "Moreover, 'the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror [who] on paper appears to be substantially similar.' " (*Id.* at p. 170.)

### 5. Alleged Error Regarding In-chambers Conferences

■ The trial court refused to allow defendant to attend in-chambers conferences regarding jury selection unless he wore shackles, because he was alleged to be an escape risk. Defendant apparently chose not to attend any conferences throughout the trial, and now contends his absence from three of them violated his rights to due process and a reliable death verdict under the Fifth, Sixth, Eighth, and Fourteenth Amendments, the California Constitution, article I, section 15, and state statutory provisions.[8] We disagree. (See generally *People v. Waidla, supra,* 22 Cal.4th at pp. 741-743.)

■ "[E]ven in a capital case, defendants may generally waive their right to be present at trial when evidence is not taken." (*People v. Riel* (2000) 22 Cal.4th 1153, 1196 [96 Cal.Rptr.2d 1, 998 P.2d 969].) This general rule applies to discussions of legal matters. (*Ibid.*) While defendant contends his waiver was coerced by the trial court's allegedly improper shackling condition, for the reasons that follow there would have been no error even without the waiver.

---

[8]Defendant asserts that these three conferences serve only as examples of the prejudice to him, and he in fact contends his exclusion made approximately 30 in-chambers conferences "prejudicial." The claim, "lacking as it is in specificity, virtually defies review." (*People v. Kraft* (2000) 23 Cal.4th 978, 1050 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Defendant first challenges a conference regarding witness Danny Chouinard. Prior to Chouinard's testimony, and *in defendant's presence*, the court and counsel discussed at length the scope of questioning allowed for this witness. In particular, the court refused to allow defendant's counsel to inquire whether the witness and Flores stopped being friends, and if so, why. Counsel anticipated the witness would say he stopped associating with Flores "because Flores was so crazy and liked to get into trouble." Chouinard in fact testified Flores was violent. On cross-examination, he testified he had told Dr. Zigelbaum that "Flores got in fights slightly more than [he] did."

At the challenged conference, defendant's counsel argued Flores's counsel's cross-examination had opened the door to the issue of why the witness stopped associating with Flores. The trial court disagreed, and stated that even if it had been opened, the line of questioning involved "too many additional side issues."

Defendant claims his presence was indispensable at the in-chambers conference because his intimate knowledge of the relationship between Chouinard and Flores would have assisted counsel in arguing to the court that the area of questioning should be allowed. However, defendant was *present* when this issue was explored at length in open court. Had he anything to contribute to counsel's argument, he was free to do so at that time. The later in-chambers conference involved nothing more than an evidentiary question of whether cocounsel had opened the door to the excluded testimony. Defendant does not assert how his presence would have assisted counsel in addressing this issue.

Defendant next challenges an in-chambers conference regarding the admissibility of statements he made to his girlfriend, Harkleroad. The discussion focused on whether Flores would be waiving his right to cross-examine defendant under *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], if Flores's counsel elicited defendant's statements from Harkleroad. While defendant is undoubtedly correct that he was familiar with both his statements and Harkleroad's, it is not apparent how this knowledge would have assisted counsel in this purely legal discussion.

Finally, defendant challenges a conference in which the trial court considered whether the defense had opened the door to certain evidence bolstering the prosecution's uncharged theory that defendant had tried to escape from jail. Defendant again fails to demonstrate how his presence would have had any bearing on these proceedings.

In sum, we cannot conclude, with respect to any of these three conferences, that defendant's personal presence was necessary for an opportunity

for effective cross-examination under the Sixth Amendment's confrontation clause, would have contributed to the trial's fairness in any marginal way for purposes of the Fourteenth Amendment's due process clause, or bore a reasonably substantial relation to the fullness of his opportunity to defend for purposes of article I, section 15 of the California Constitution or Penal Code sections 977 and 1043. (*People v. Waidla, supra,* 22 Cal.4th at p. 742.) Given that defendant had no right to attend these three in-chambers conferences, it is not relevant that he did not attend because of the condition imposed for jury selection conferences that he be shackled. We therefore need not address the propriety of this aspect of the trial court's order.

### 6. *Alleged Error in Admitting Defendant's Statement*

Defendant contends the trial court erred in denying his motion to suppress his August 12, 1989, statement to police because it was purportedly obtained and admitted at trial in violation of his right to remain silent, to the assistance of counsel, and to due process.

On August 10, 1989, approximately 9:45 p.m., defendant was taken into custody. Approximately 11:00 p.m., after being advised of and waiving his *Miranda* rights, he was interrogated by Detectives Grant Raybould and Pat Ruffner. This interrogation, including breaks, lasted approximately four hours. Defendant made several inconsistent statements regarding his activities on August 9, the day of the murders. Defendant ultimately acknowledged he was at the house with Flores, and said he had hit Chandler with a baseball bat after Flores initiated a violent confrontation with Chandler. He also expressed a willingness to take a polygraph exam. Defendant does not challenge the admission of this statement.

Detective Raybould testified at the hearing on defendant's motion to suppress his second statement made to police on August 12, 1989. According to Raybould, on August 12, 1989, approximately 10:10 a.m., he went to the county jail to give defendant a polygraph test. Defendant was brought from his cell and taken to the interview room. Raybould told defendant he was there to reinterview him and do the previously discussed polygraph exam. Defendant said an attorney had told him not to speak with anyone. Raybould told defendant he was "not aware there was an attorney involved." Defendant said, "No, that's okay. Just go ahead and advise me of the rights." Raybould had explained to defendant he "would have to advise him of any rights prior to this interview and polygraph."

Raybould told defendant he was not certain what his obligation was at that point, since an attorney had come over to visit him. Defendant told him he

had not hired an attorney or signed any papers for an attorney; "an attorney had come over and left a card with him." Raybould asked defendant if he wanted to consult with that attorney prior to any further questioning, and defendant said no. "I had a tape recorder with me, and I asked him if we could put on tape the essence of the conversation we were having. He was reluctant to put it on tape." Raybould told him it was for everyone's benefit.

During the taped portion of the interview, which began at 10:20 a.m., Raybould stated, "When I came in here . . . I came over and told you that I wanted to talk to you some more and that, that we may want to do a polygraph today and that I was going to admonish you of your rights. You told me that your lawyer told you not to talk to anyone. And I told you that I didn't know you had an attorney and that that sort of brought some new rules into what we were allowed to do. I told you that I, in my opinion, I didn't think that I would be able to interview you or do a polygraph if you had an attorney without me first going through that attorney. Tell me again about the attorney and whether he's representing you or what you consider his role to be at this point because I'm not real clear on that and I'd like to get that on tape." Defendant answered, "He didn't, I didn't call him. My parents didn't call him. He came down the day after I was put into jail. He gave me his card and said 'I'll be,' I mean 'Get in touch with me or I'll be back in touch with you.' And that was pretty much it. I didn't sign any papers saying that he was my attorney or anything but he said, 'Try not to talk to anyone that'll get you into any more trouble than you already are.' Or whatever, something like that." Raybould inquired, "Okay. Let me just ask you, first of all, do you consider him to be your attorney, representing you?" "No. Not yet. No." "Okay. Do you want me to admonish you of your rights—" "Yes." "[A]nd ask you questions that I'd like to clarify and also explain things—" "Yes." "[T]hat I've learned since I last talked to you?" "Yes." "Do you want to do this without the presence of that attorney—" "Yes." "[O]r any other attorney?" "Yes." "You don't have to do this, Chris." "I know. I know." "I want this to be free and voluntary on your part." "Okay." Raybould then told defendant he was going to admonish him of his rights and that defendant could turn the tape recorder off whenever he wished. After giving defendant his *Miranda* rights, Raybould asked, "Do you understand each of these rights that I have explained to you?" "Yes." "Having in mind and understanding your rights as I have told you are you willing to talk with me?" "Yes." Raybould began to speak again, and defendant turned off the tape recorder.

The interview continued untaped for more than an hour. Defendant at no time said he did not want to speak with Raybould.

During the hearing on the motion to suppress, Raybould testified his purpose in asking defendant further questions about the attorney was that

"[i]t wasn't clear to me whether he was being represented or not." As a result of this questioning, it was clear to Raybould defendant was not invoking his right to have counsel present during questioning.

Defendant also testified at the hearing on the motion to suppress. After initial pleasantries, Raybould said that he "wanted to ask me some questions about my previous testimony to him." Defendant replied, "I don't want to talk to you." Raybould asked, "Why?" "[A]n attorney told me not to talk to anyone else." Three times defendant told Raybould he did not want to talk to him. When defense counsel inquired at the hearing why defendant had not mentioned on tape "that on three occasions you had told Detective Raybould that you did not want to speak to him?" defendant replied, "I didn't think it mattered."

The trial court found Raybould's version of events credible and denied the motion to suppress.

In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], the scope of our review is well established. " 'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' " (*People v. Bradford, supra*, 14 Cal.4th at p. 1033.) "We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*." (*Ibid.*)

Once a suspect receives *Miranda* warnings, he "is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Oregon v. Elstad* (1985) 470 U.S. 298, 308 [105 S.Ct. 1285, 1293, 84 L.Ed.2d 222].) If he thereafter requests counsel, " 'the interrogation must cease until an attorney is present.' " (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [101 S.Ct. 1880, 1883, 68 L.Ed.2d 378], quoting *Miranda v. Arizona, supra*, 384 U.S. at p. 474 [86 S.Ct. at p. 1628].) If a suspect's request for counsel or invocation of the right to remain silent is ambiguous, the police may "continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights." (*People v. Johnson* (1993) 6 Cal.4th 1, 27 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see *Davis v. United States* (1994) 512 U.S. 452, 461 [114 S.Ct. 2350, 2356, 129 L.Ed.2d 362] [police may seek to clarify suspect's ambiguous reference to counsel].) "The state must demonstrate the voluntariness of a confession by

a preponderance of the evidence." (*People v. Bradford, supra*, 14 Cal.4th at p. 1033; see *Colorado v. Connelly* (1986) 479 U.S. 157, 168 [107 S.Ct. 515, 522, 93 L.Ed.2d 473]; *Lego v. Twomey* (1972) 404 U.S. 477, 489 [92 S.Ct. 619, 626, 30 L.Ed.2d 618].)

■ Here, the trial court's resolution of disputed facts and its evaluations of credibility are substantially supported by Officer Raybould's testimony and the taped portion of the interview. Accepting this version of events, as we must, defendant's statement to Raybould that either an attorney or his attorney had told him not to speak with anyone was ambiguous as to whether defendant was invoking either the right to remain silent or the right to counsel. As such, Raybould was justified in clarifying whether defendant was exercising these rights, and did so exhaustively. Defendant's motion to suppress was properly denied.

### 7. Severance Motions

■ The trial court granted the prosecution's motion to consolidate defendant's case with that of Flores. Defendant contends the trial court's denial of his ensuing motions to sever the trials violated his federal constitutional rights to due process, an impartial jury, a fair trial, and a reliable death verdict.

■ Under section 1098, "[w]hen two or more defendants are jointly charged . . . they must be tried jointly, unless the court order[s] separate trials." In light of this legislative preference for joinder, separate trials are usually ordered only " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*People v. Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306], quoting *People v. Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869].) A trial court's ruling on a severance motion is reviewed for abuse of discretion on the basis of the facts known to the court at the time of the ruling. (*People v. Alvarez, supra*, 14 Cal.4th at p. 189; *People v. Cummings* (1993) 4 Cal.4th 1233, 1287 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

■ Here, at the time the trial court first ruled on the severance motion, it expressly noted that by seeking consolidation, the prosecutor risked "total exclusion" of defendants' statements. (See *People v. Cummings, supra*, 4 Cal.4th at p. 1287.) Subsequently, Flores testified at trial,

and hence defendant had no *Aranda* objection to his statement, and Flores introduced defendant's statements, thereby waiving his own *Aranda* objections. (See *People v. Aranda, supra,* 63 Cal.2d 518.) Thus, while defendant renewed his severance motion several times during trial, no circumstance developed which required the trial court to change its initial ruling.

Nor did defendant suffer a prejudicial association with Flores. Along these lines, defendant contends severance was required because defendant, but not Flores, was subject to the death penalty. However, as the trial court stated, "The exclusion of the death penalty against Flores is not based upon an election by the People. . . . If the jury should conclude somebody must pay with his life, it would be more likely to exact that penalty from [defendant] in a separate trial, since it could not reach anyone else." The jury was aware that Flores was not subject to the death penalty because of his age at the time of the crimes.

In addition, defendant claims he was denied his right to confrontation by certain extrajudicial statements made by Flores's witnesses. He does not, however, identify these witnesses (other than Dr. Zigelbaum), or indicate why their testimony would not be admissible on behalf of the People in a separate trial. (See *People v. Cummings, supra,* 4 Cal.4th at p. 1288.) Even assuming Dr. Zigelbaum's testimony would not have been admitted at a separate trial, the trial court precluded this expert from opining as to *defendant's* mental state. Moreover, Zigelbaum was not permitted to testify that in his opinion the events on August 9, 1989, at the Gilhousen residence had occurred in a certain way. Rather, he was asked to assume that certain events had occurred and base his opinion on these assumptions. The jury was expressly and repeatedly instructed that the assumptions were not evidence, and that the jury was the sole finder of fact as to what had occurred on that day. In addition, as noted above, Zigelbaum was impeached by an ongoing Massachusetts medical license review and by certain inaccuracies on his resume. Indeed, it is apparent the jury rejected Zigelbaum's opinion in any event since it found Flores guilty on all counts.

Nor was defendant prejudiced by his inability to conduct voir dire in a manner that openly indicated why he was exercising his peremptory challenges. A severed trial is nonetheless adversarial, and even in that situation a defendant would likely be circumspect about defense strategy at the jury selection stage. Nor does defendant persuasively explain how certain jurors' possible low opinion of Flores's counsel would prejudice him.

Moreover, contrary to defendant's assertion, severance was not required merely because it was anticipated defendants would attempt to shift responsibility for the capital crimes to each other. (*People v. Alvarez, supra,* 14

Cal.4th at p. 190; *People v. Cummings, supra,* 4 Cal.4th at p. 1287.) Here, as in *Cummings,* the defense positions were antagonistic because the circumstances of Chandler's death, and the identity of April's and Bryan's killer, were in dispute. "That each was involved in the incident was undisputed, however, and the prosecution had offered evidence sufficient to support verdicts convicting both defendants. . . . [T]his was not a case in which only one defendant could be guilty. . . . Here the prosecution theory was that both defendants participated in, and were guilty of, the murder[s]." (*Cummings, supra,* 4 Cal.4th at p. 1287.) The jury was presented with a straightforward decision regarding both defendants' relative culpability; its verdict finding each defendant guilty as charged reveals it accepted neither defense.

Finally, contrary to defendant's speculation, there is no evidence Flores would have offered testimony exonerating defendant had they been separately tried. (*People v. Cummings, supra,* 4 Cal.4th at p. 1286.) In sum, no gross unfairness depriving defendant of a fair trial or due process is evident. (*People v. Turner, supra,* 37 Cal.3d at p. 313.)

### 8. *Alleged Briggs Instruction Error*

Defendant contends the trial court improperly emphasized the Governor's commutation power in violation of *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. We disagree.

In *Ramos,* this court held that portion of section 190.3 embodying what came to be known as the "*Briggs* instruction" was unconstitutional under state law. (*People v. Ramos, supra,* 37 Cal.3d at p. 159; cf. *California v. Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171] [upholding same instruction against federal constitutional challenge].) This section provides that at the penalty phase "[t]he trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in [the] future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California."

Here, during voir dire, the trial court explained to the prospective jurors that it was the jury's responsibility, if the issue of penalty were reached, to make a choice between the penalty of death or life imprisonment without the possibility of parole. Out of concern that the subject of whether any penalty chosen would realistically be carried out would come up during jury deliberations, the court stated, "[Y]ou must assume that if you sentence somebody . . . [to] death, in due course that person will die. . . . Now, the Governor

has the power to commute death sentences, but that's his problem; not yours. And there is no reason to believe that the Governor is going to decide that you were wrong. So don't look to anybody else to make any such decision. The buck stops here, and so if you serve on this jury, you must expect that you will make the decision which will be carried out. Now, the same thing has to be said of the penalty of life without possibility of parole. It means it. It means that a person who is so sentenced will die in prison, but not by the act of the state; rather of natural causes sooner or later. Now, it's also true that the Governor has the power to commute a sentence of life without possibility of parole. We had that penalty for one kind of offense or another for a good many years . . . . So far as I know, no Governor has ever commuted one of those sentences, and if you have been paying any attention to the politics, you can figure quite practically that the sentence means it. So those will be your choices, if you come to the issue, and you will bear the ultimate burden of making the choice. There is no thinking, 'Oh well, somebody else will fix it.' . . . And so you can expect your decisions ultimately to be carried out, whichever they are. You do bear the ultimate responsibility."

Following the trial court's statement to the first panel of prospective jurors, defendant moved for a mistrial based on the comments regarding the Governor's power to commute a sentence. The matter was revisited the next day, and the People at that time also requested a new jury panel. This request and the motion for a mistrial were denied.

As can be seen, no *Briggs* instruction was given. As a preliminary matter, the instruction was given during voir dire, when "the jury's attention is not narrowly focused on its duty to select a penalty," not at the end of the penalty phase. (*People v. Pinholster* (1992) 1 Cal.4th 865, 918 [4 Cal.Rptr.2d 765, 824 P.2d 571].) More critically, the prospective jurors were expressly told they bore the final responsibility for deciding penalty, and that in doing so they should *not* consider the Governor's power to commute either a death sentence or a sentence of life imprisonment without the possibility of parole. "The jury, having been so advised, could not have been misled as to the nature and scope of the commutation power." (*People v. Coleman* (1988) 46 Cal.3d 749, 782 [251 Cal.Rptr. 83, 759 P.2d 1260].) No error is evident.

### 9. *Admission of Victim and Surrounding Crime Scene Photographs*

Defendant contends the trial court erred in denying his motion to exclude exhibits 2B and 2C, which depict the Gilhousen living room, because they include framed photographs of the victims while alive. Our independent review of the exhibits indicates this is not the case; rather, the frames in the exhibits are empty.

Defendant also asserts these exhibits were irrelevant. We disagree. They were relevant to support the prosecution's theory that defendant and Flores were aware of the baseball bat's location in that room, and that the room was arranged in a manner that would have allowed Randi Renken to overhear the conversation between defendant, Flores, and April regarding the pound of marijuana and the amount of drug proceeds April had recently earned.

Defendant contends that the trial court also erred in admitting exhibits 1, 8, 13, 16, 18, and 19, which are photographs of the victims' bodies and the surrounding crime scene. He objected below to exhibits 1, 8, 13, and 16 on the ground they were cumulative, and to exhibits 18 and 19 on the grounds they were cumulative and irrelevant. These exhibits contained more than one photograph of each victim or crime scene.

Defendant now contends these exhibits were not only cumulative and irrelevant, but also unduly prejudicial. To the extent the last claim is waived, he asserts that counsel was ineffective in failing to object on this basis. We conclude on the merits there was no error.

Contrary to defendant's assertion, the photographs were relevant to the prosecution's case. Here, the first degree murder charges were tried under the theory that the killings were premeditated or perpetrated during a robbery and burglary. "The photographs were pertinent because they showed the nature and placement of the fatal wounds," and supported the prosecution's theory regarding how the murders occurred. (*People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643]; see *People v. Crittenden, supra*, 9 Cal.4th at pp. 132-133.) In addition, the photographs clarified the coroner's and other witnesses' testimony regarding the victims' wounds and the locations in which two of the victims' bodies were found. (*People v. Crittenden, supra*, 9 Cal.4th at p. 132.) Contrary to defendant's assertion, the prosecution was not obligated to "accept antiseptic stipulations in lieu of photographic evidence." (*People v. Pride, supra*, 3 Cal.4th at p. 243; see *People v. Crittenden, supra*, 9 Cal.4th at p. 133.)

Moreover, the photographs were not cumulative. "We often have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish." (*People v. Crittenden, supra*, 9 Cal.4th at pp. 134-135.) The same principle applies to crime scene photographs. While defendant contends the photographs "were cumulative of each other," "depicting essentially the same view of the victims," our review of the record is otherwise. Indeed, the trial court carefully evaluated defendant's objections, the prosecution's response thereto, and the coroner's voir dire testimony, and excluded several photographs on this basis.

Defendant contends the trial court erred in not expressly considering whether the probative value of the photographs outweighed their prejudicial impact. Of course, as noted above, defendant did not challenge the photographs on this basis. Moreover, the trial court " 'need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so . . . .' " (*People v. Waidla, supra,* 22 Cal.4th at p. 724, fn. 6.) " 'The record as a whole shows the court was well aware of, and consistently performed, its duty . . . to balance the probative value of evidence against any prejudicial effect.' " (*People v. Riel, supra,* 22 Cal.4th at pp. 1187-1188.) In any event, after independently reviewing the photographs, we conclude they were not unduly gruesome or inherently inflammatory, and are unpersuaded for the reasons above that we should reach a different result based on the graphic nature of the photographs, the number of photographs, or the fact that one of the victims was a child. (*People v. Pride, supra,* 3 Cal.4th at p. 243.)

■ Finally, defendant contends admission of the photographs was also unduly prejudicial at the penalty phase. Here, the challenged evidence, which illustrated the precise nature of the crime, was admissible under section 190.3, factor (a) (factor (a)). Factor (a) makes admissible evidence of the " 'circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . .' " (*People v. Davenport, supra,* 11 Cal.4th at pp. 1205-1206.)

In *People v. Davenport, supra,* 11 Cal.4th 1171, we first noted that defendant had waived any objection to the challenged photographs and physical evidence by failing to object below. (*Id.* at p. 1205.) Had the claim been preserved, we would have then concluded it lacked merit because the trial court has no discretion under Evidence Code section 352 to exclude such evidence at the penalty phase on the basis that it is unduly inflammatory or lacking in probative value. (*People v. Davenport, supra,* 11 Cal.4th at p. 1206.) In so doing, we relied on *People v. Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189]. (*People v. Davenport, supra,* 11 Cal.4th at p. 1205.) We further observed that the trial court retains its inherent discretion to exclude evidence admissible under factor (a) based on the form of the evidence, i.e., that a particular piece of evidence is inaccurate or cumulative. (*Davenport, supra,* 11 Cal.4th at p. 1206.)

Similarly here, defendant did not object below that the prejudicial impact of the challenged photographs outweighed their probative value at the penalty phase. Nevertheless, defendant makes such a challenge in this court.

Reading *Davenport* as a whole, including its reliance on *Karis,* it stands for the proposition that the trial court lacks discretion to exclude *all*

factor (a) evidence on the ground it is inflammatory or lacking in probative value. (See *People v. Karis, supra,* 46 Cal.3d at pp. 641-642, fn. 21, italics added ["We hold here only that the court does not have discretion to prevent introduction at the penalty phase of *all* evidence of a capital defendant's commission or attempted commission of a prior violent felony."].) Neither factor (a) nor section 190.3, factor (b) (factor (b)), however, deprives the trial court of its traditional discretion to exclude "particular items of evidence" by which the prosecution seeks to demonstrate either the circumstances of the crime (factor (a)), or violent criminal activity (factor (b)), in a "manner" that is misleading, cumulative, or unduly inflammatory. (*People v. Karis, supra,* 46 Cal.3d at pp. 641-642, fn. 21.)

We emphasize, however, that at the penalty phase, the trial court's discretion to exclude circumstances-of-the-crime evidence as unduly prejudicial is more circumscribed than at the guilt phase. During the guilt phase, there is a legitimate concern that crime scene photographs such as are at issue here can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes. Such concerns are greatly diminished at the penalty phase because the defendant has been found guilty of the charged crimes, and the jury's discretion is focused on the circumstances of those crimes solely to determine the defendant's sentence. Indeed, the sentencer is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light.

Moreover, the question of whether evidence is unduly inflammatory is closer under factor (b) than factor (a) to the extent the penalty jury must decide whether the factor (b) crime actually occurred beyond a reasonable doubt as well as assess its moral weight for purposes of sentencing. (See *People v. Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) The factor (b) evidence, even if it fairly depicts the moral blameworthiness of the defendant, may nonetheless be excludable under Evidence Code section 352 insofar as it unfairly persuades jurors to find the defendant guilty of the crime's commission. This danger is not present with factor (a) evidence at the penalty phase because the jury has already found the defendant guilty of the capital offense. The trial court's Evidence Code section 352 discretion to exclude relevant factor (a) evidence is reduced accordingly.

Here, the prosecution did not introduce any evidence at the penalty phase, but merely relied on its guilt phase evidence. We have already concluded the challenged photographs were not unduly prejudicial at the guilt phase. Thus, for the reasons stated above, defendant was not unduly prejudiced at the penalty phase.

### 10. *References to Bryan's Third Birthday*

Prior to trial defendant moved in limine to preclude any reference to the fact that Bryan was murdered on his third birthday. The trial court denied the motion, stating that the "circumstances of the birthday celebration [were] relevant," the "fact it was the child's birthday adds little to the emotional impact of the homicide itself," and "[c]oaching witnesses to leave out facts impairs the ability of juries to evaluate their credibility."

Defendant here renews his contention that the references to the fact that Bryan was killed on his third birthday were irrelevant to any contested fact and should have been excluded. No error is demonstrated. Evidence regarding Bryan's birthday helped place the testimony of prosecution witnesses in context and assisted the jury in assessing their credibility. For example, Randi Renken indicated she had the opportunity to see the significant sum of money later stolen from April's purse because the two shopped for birthday presents the day before the capital crime. The trial court was reasonably concerned that requiring witnesses to edit their testimony might make that testimony seem halting and less credible. In addition, the trial court was correct that the fact of the birthday added little to the emotional impact of a three-year-old's murder. The trial court was well within its discretion in concluding the probative value of the evidence outweighed its prejudice. In any event, even assuming the trial court erred, defendant could not have been prejudiced, since he said in his police statement, which the jury heard, that he knew August 9 was Bryan's birthday prior to going to the Gilhousen residence that morning.

Defendant also contends admission of this evidence prejudiced him at the penalty phase because the prosecutor asked the jury to consider the circumstances of the crime, including the fact that defendant knew it was Bryan's third birthday, and nevertheless went to the Gilhousen residence on August 9, and returned there after unsuccessfully chasing Rodney Almond. Such argument was fair comment on the evidence, and could properly be considered in assessing defendant's moral culpability at sentencing. Indeed, defense counsel also referred to Bryan's birthday in his penalty phase closing argument.

### 11. *Alleged Error in Limiting Impeachment of Expert Witness*

As noted above, Dr. Zigelbaum testified as an expert witness on Flores's behalf, and opined that Flores had dependent personality traits. (See *ante*, at pp. 1175-1176.) Zigelbaum's credibility was impeached when it was revealed that the Massachusetts State Board of Registration had filed formal

charges of unprofessional conduct against him that could result in revocation or suspension of his medical license. Defendant's counsel was precluded, however, from eliciting the nature of the charges, which included allegations of sexual misconduct with six patients, and use of cocaine and marijuana with patients and a baby-sitter. Defendant contends the trial court's ruling rendered the trial fundamentally unfair and violated his right to confront and cross-examine witnesses under the federal and state Constitutions.

Confrontation clause and fairness principles generally guarantee a criminal defendant the right to explore a witness's bias on cross-examination. (See *Davis v. Alaska* (1974) 415 U.S. 308, 316 [94 S.Ct. 1105, 1110, 39 L.Ed.2d 347].) They do not, however, prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674].) Here, at the time of trial, the charges of unprofessional conduct against Zigelbaum, while significant and troubling, were pending and unadjudicated. Unlike *Lindh v. Murphy* (7th Cir. 1997) 124 F.3d 899, on which defendant relies, the jury learned Zigelbaum's license to practice medicine was under review because of allegations of professional misconduct; it simply did not learn what those allegations were. The trial court reasonably concluded the proposed line of questioning was extraneous under Evidence Code section 352. While defendant now refers to the impeachment value of a "parade of six responsible citizens . . . testifying," he never sought to introduce such evidence below. Rather, defense counsel proposed cross-examining the doctor on the basis of newspaper articles. Indeed, it is not even clear the names of the six complaining patients were public information. Moreover, while defendant was permitted to elicit that Zigelbaum was currently "anathema" to the prosecution offices listed on his resume, he never did so.

Even assuming the trial court erred in precluding the testimony regarding the nature of the charges, it is apparent defendant was not prejudiced at either the guilt or penalty phase. As noted above, Zigelbaum was not permitted to testify that in his opinion the events on August 9, 1989, at the Gilhousen residence had occurred in a certain way. Rather, he was asked to assume that certain events had occurred and base his opinion on these assumptions. The jury was expressly and repeatedly instructed that the assumptions were not evidence, and that the jury was the sole finder of fact as to what had occurred on that day. Nor was Zigelbaum permitted to state an opinion as to *defendant's* mental state. Moreover, Zigelbaum was impeached not only by the fact that misconduct charges were pending, but also by the fact that he was not board-certified in either psychiatry or forensic psychiatry, his curriculum vitae was substantially misleading, and his opinion of Flores's diminished culpability for the murders was unshaken by

Flores's seemingly inconsistent behavior, such as his failure to seek assistance from anyone after Chandler's death even though he had the opportunity to speak to his sister, and later to Burns when defendant was not present. Indeed, it is apparent the jury rejected Zigelbaum's opinion as not credible, because it convicted Flores on all first degree murder, robbery, burglary, and conspiracy counts.

Defendant further summarily argues that as a result of Zigelbaum's testimony, he was entitled to an independent psychiatric exam of Flores. He cites no basis on which such an exam is authorized, and we are aware of none.

### 12. *Alleged Error in Admitting Attempted Escape Evidence*

 Defendant alleges the trial court erred in admitting evidence of his uncharged escape attempt to show consciousness of guilt. We disagree.

On August 22, 1990, defendant was housed on the third floor of the San Diego jail. That morning, he was allowed to leave the third floor and walk up to the sixth floor dispensary. Approximately 11:00 a.m., when defendant was done, he was placed back in the stairwell and sent to the third floor. When he arrived at the third floor, Deputy Sheriff Barber was unable to open the door at that time and told defendant to wait. Approximately 30 minutes later, when Barber turned his attention to the stairwell, defendant was not there. A search ensued. Shortly afterwards, defendant was seen descending the stairwell to the third floor entrance. A subsequent search revealed defendant had hidden tan "trusty" clothing under his blue jail outfit. Such clothing was stored in the eighth floor laundry and occasionally left in a neighboring portion of the stairwell. "Trusties" were inmates who generally had greater privileges, including the ability to leave the jail on work assignments. Defendant was not a trusty, and was therefore not permitted to have such clothing.

The trial court overruled defendant's relevance and Evidence Code section 352 objections to this evidence, finding it relevant and stating "its greatest tendency would be to suggest that [the district attorney] lacks confidence in her circumstantial case and that she's grabbing . . . . Now, the real question that you're raising and that we ought not to ignore, even though we aren't trying it at this time, is the suggestion that the mention of the concept of escape is going to prejudice the jury on the question of penalty, if we come to that stage. I simply do not believe that jurors are entitled to that little credit, that the idea that somebody might escape would never occur to them; and given the quality of the evidence of this . . . . this flimsy escape is not going to terrify the jury that some madman may be afoot in the community,

and therefore I do not find it unduly prejudicial under 352." The jury was instructed at the time the evidence was received that it was admissible for the limited purpose of what "bearing as it may have in showing [defendant's] consciousness of guilt." In addition, it was instructed at the conclusion of the guilt phase, "The attempted escape of a person after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not the evidence shows an attempted escape or a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your consideration."

The trial court acted within its discretion in admitting the evidence, subject to appropriate limiting instruction. "Evidence of a planned escape permits an inference of consciousness of guilt, even if the escape was not actually attempted." (*People v. Morris* (1991) 53 Cal.3d 152, 196 [279 Cal.Rptr. 720, 807 P.2d 949].) Here, the evidence showed both that defendant possessed contraband and one use for that contraband. While defendant is correct that defendant's intent in possessing the clothes was not "clear and unambiguous," the jury was instructed this was an issue for it to decide. No error is evident.

Nor could defendant have been prejudiced at the penalty phase. No reference to the incident was made at the penalty phase, and the jury was instructed as to the factors it could appropriately consider in determining penalty. (See *People v. Riel, supra,* 22 Cal.4th at pp. 1208-1209.) We therefore reject defendant's claim that he was deprived of a fair and reliable penalty determination.

### 13. *Alleged Misconduct by Prosecutor and Codefendant's Counsel*

Defendant alleges numerous instances of misconduct by both the prosecutor and Flores's counsel during the guilt phase, claiming they violated his constitutional right to due process and a fair trial. At the outset we note that as a general rule, objections to codefendant's counsel's actions do not fall within the rubric of "misconduct." ▪▪▪ Reasonably understood, the claim on appeal is that the trial court violated the evidence rules in admitting certain testimony over defendant's objection.

Here, Flores's counsel elicited from Flores that Flores was afraid of defendant after he saw defendant hit Chandler with a baseball bat. Counsel then asked, "Are you still afraid of Chris Box?" "Yes." Counsel then approached Flores, and asked, "What is this?" "It's a[n] elevator band."

"What's an elevator band?" "It's so when I have to go places, I go through the elevator instead of the stairwell." "And why don't you go in the stairwell?" Defendant's objection was sustained.

Flores's evidence that he was afraid of defendant was relevant to his duress defense. Moreover, Flores and defendant blamed each other for the murders. The jury could reasonably conclude that if Flores's version of the August 9 events were true, he had reason to fear defendant; if his version were false, he similarly should feel frightened of him.

During Flores's cross-examination of Rodney Almond, counsel asked if Almond recalled testifying at the preliminary hearing. Almond said yes. "You had—or you expressed some reluctance at that hearing in identifying Mr. Box, didn't you?" "Right." "Was that because you felt you were being threatened?" "Yeah, I believe so." Defendant objected, and the court stated, "Oh, I think I'll let you take care of it on cross." On redirect, the prosecutor asked, "Were you afraid of Mr. Box when you testified at the first preliminary exam?" "No, I don't believe so." On cross-examination by defendant's counsel, Almond was asked, "And when you stated that you felt threatened and that's why you didn't identify Mr. Box, you weren't threatened by Mr. Box in particular, were you?" "No."

Of course, the reason Almond failed to originally identify defendant was relevant to the strength of his identification at trial. The trial court therefore did not abuse its discretion in overruling the objection. Moreover, Almond subsequently clarified any misimpression created by his response to the question posed by Flores's counsel.

 Defendant also contends there were several instances of prosecutorial misconduct. First, he claims the prosecutor violated a court order when she asked jail guard Edward Wells on how many occasions he had seen a trusty make an unauthorized trusty badge. Defense counsel objected and moved for a mistrial. The trial court denied the motion, and expressly ruled that the question was within what it intended to be the scope of its order, and if the court had been presented with that question at the time of its ruling, "I would have allowed that question and answer and nothing more." It also stated, "That much is legitimate; that much she's got; that's all she gets."

Next, defendant claims the prosecutor committed misconduct during her questioning of Dennis Burns. Burns testified on cross-examination that prior to his testimony at the preliminary hearing he had taken two Valium pills, and that he had lied under oath at the hearing when he testified he had not taken any drugs that day. On redirect, the prosecutor asked, "At the time that

you testified at the preliminary exam for Mr. Box you testified to the same material that you're now telling the jury; is that correct?" "Yes." "And you had taken two Valiums before you came to court?" "Yes, I did." "Why?" "I was scared." "Of what?" "Well—" Defense counsel's objection was overruled. Burns said, "Well, first of all, I heard the first preliminary hearing had some—or first hearing had some problems in the hallway. I was—you know, I was afraid about taking the stand. I was nervous. I hear Valiums calm that." There was no objection, and the subject matter was changed.

Assuming defendant has not waived a claim of prosecutorial misconduct by failing to renew his objection, there was no misconduct. Contrary to defendant's assertion, the prosecutor did not question Burns "in such a way that implied he had been threatened by" defendant. Nor did her questioning "create the implication that [defendant] was responsible for causing problems in the hall or for authorizing someone to frighten witnesses." Indeed, it was unclear whether the hearing Burns referred to involved defendant, or what the "problems" were with reference to that hearing; moreover, his information was not based on personal knowledge.

Next, defendant challenges a conversation between the prosecutor and Almond at the preliminary hearing. As noted above, Almond testified at trial that he had initially failed to identify defendant at the preliminary hearing because he felt threatened. On cross-examination, defendant's counsel asked Almond, "[W]hen you stated that you felt threatened and that's why you didn't identify Mr. Box [at the preliminary hearing], you weren't threatened by Mr. Box in particular, were you?" "No." "In fact, when you initially failed to identify him, there was a recess in the proceedings, correct?" "Right." Almond further testified that the prosecutor had taken him to a back room and said "something to the effect that 'This isn't a game and don't bullshit around. This is serious.'" Defense counsel inquired, "And so after you had this conversation with [the prosecutor], you were then able to make an identification?" "Right."

Contrary to defendant's assertion, reminding a witness of the gravity of the proceedings is not misconduct. Nothing in the prosecutor's remarks can be construed as coercion or intimidation to testify falsely.

Finally, defendant contends that during closing argument, the prosecutor "referred to 'facts' which were nowhere in evidence, and invited jurors to base their verdict on unfounded speculation." In particular, defendant now objects to the prosecutor's statement that Bryan said to defendant, "Chris, why did you break my mommy's window?" We reject defendant's claim at the outset because he failed to satisfy the general rule requiring assignment

of misconduct and request for admonition as to the prosecutor's comment of which he now complains, and no exception is applicable. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

We also reject the claim on the merits. In Flores's police statement, which was presented to the jury, he stated that he and defendant drove off to look for Almond. When they did so, defendant closed the door and it locked. When defendant returned, he had to break Bryan's bedroom window to reenter. "He broke the window and that's when . . . he said the little boy said, 'You broke my window.' " Moreover, there was evidence in the record that Bryan knew defendant and called him "Chris." While the prosecutor clearly modified Flores's statement to increase its sympathetic value, her modification was based on inferences drawn from the record. Moreover, defendant was free to remind the jury of the actual language in Flores's statement. No misconduct is evident.

### 14. *Alleged Instructional Error*

Defendant alleges the trial court committed numerous reversible instructional errors that deprived him of due process, a fair trial, effective assistance of counsel, a reliable guilt determination, and a reliable death verdict. We do not find his claims persuasive.

First, defendant contends the trial court erred in instructing the jury that the testimony of a single witness, if believed, was sufficient to establish defendant's guilt, but failing to instruct the jury that an accomplice's testimony must be corroborated and should be viewed with distrust. (§ 1111; CALJIC Nos. 2.27, 3.11, 3.18; see CALJIC Nos. 3.10, 3.12, 3.13.) Defendant requested such accomplice instructions below. The court denied the request, stating such an instruction was generally inapplicable when the accomplice was a codefendant, and it would be fundamentally unfair to Flores.

We have since clarified that "whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies," the court should sua sponte instruct the jury as follows: " 'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.' Such a pretailored instruction is applicable regardless which party called the accomplice." (*People v.*

*Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

Here, of course, neither the prosecution nor defendant called Flores as a witness, and hence *Guiuan* is not directly controlling. Nevertheless, just as in the case of an accomplice called to testify by the prosecution, Flores's testimony was "subject to the taint of an improper motive, i.e., that of promoting his . . . own self interest by inculpating the defendant." (*Id.* at p. 568.) Thus, there appears to be no persuasive reason not to require such an instruction when requested by a defendant in a case where the codefendant testifies. (See *People v. Alvarez, supra,* 14 Cal.4th at pp. 217-219 [trial court did not abuse its discretion in instructing jury to view with distrust testimony of an accomplice-defendant that tends to incriminate a codefendant because such a defendant "has the motive, opportunity, and means to try to help himself at the other's expense"].) Accordingly, here, the trial court should have instructed the jury to view Flores's testimony with care and caution to the extent it tended to incriminate defendant.

Nevertheless, defendant was not prejudiced. The jury was aware defendant and Flores were at the scene when the triple murder occurred, and had every motivation to shift blame to each other. Moreover, Flores's testimony was corroborated by the physical evidence, defendant's statements, and the testimony of other witnesses, including Almond. Under these circumstances, it is not reasonably probable that the jury would have reached a result more favorable to defendant had it been instructed to view with care and caution that portion of Flores's testimony that inculpated defendant. (See *People v. Arias* (1996) 13 Cal.4th 92, 143 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Mincey, supra,* 2 Cal.4th at p. 461.)

Defendant next contends the trial court erred in failing to instruct that if the jury found Flores's testimony "failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence. . . ." (CALJIC No. 2.62.) The trial court expressed concern the instruction was not appropriate when only one codefendant testifies, and noted he could not possibly rule on the propriety of the instruction until after Flores actually testified. Defendant did not renew the request after Flores's testimony, and hence the claim is waived on appeal.

Nor was counsel ineffective in failing to renew the request. Even now defendant does not persuasively identify what facts were in Flores's particular knowledge that he failed to explain or deny, warranting this instruction. (*People v. Saddler* (1979) 24 Cal.3d 671, 682-683 [156 Cal.Rptr. 871, 597 P.2d 130].)

 Next, defendant contends the trial court erred in instructing the jury that if it found defendant had attempted an escape, that was "not sufficient in itself to establish his guilt," but was a fact that may be considered "in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not the evidence shows an attempted escape or a consciousness of guilt and the significance to be attached to such a circumstance are matters for your consideration." There was no error. As noted earlier, "Evidence of a planned escape permits an inference of consciousness of guilt, even if the escape was not actually attempted." (*People v. Morris, supra*, 53 Cal.3d at p. 196.) Nor did the instruction prejudice defendant at the penalty phase. Again, as noted above, the evidence of attempted escape was not mentioned at the penalty phase, and the jury was instructed regarding the factors it could appropriately consider in determining defendant's sentence.

Next, defendant contends the trial court erred in modifying the former reasonable doubt instruction. (Former CALJIC No. 2.90.) As modified, the instruction provided: "Reasonable doubt is a state of the case in which the jurors, after comparison and consideration of all the evidence, do not feel an abiding conviction to a moral certainty of the truth of the charge. It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt." While we have cautioned "against trial court experimentation" with this instruction, the jury was adequately advised of the People's burden of proof. (*People v. Freeman* (1994) 8 Cal.4th 450, 504 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]; see *Victor v. Nebraska* (1994) 511 U.S. 1, 6 [114 S.Ct. 1239, 1243, 127 L.Ed.2d 583].)

Defendant next contends the trial court erred in modifying CALJIC No. 2.00 regarding the definition of circumstantial evidence.[9] In particular, he contends the trial court's instruction "failed to inform jurors that the crucial facts from which inferences could be drawn were limited to those facts which were themselves established by the evidence." As such, the jurors would have felt at liberty to include such extraneous considerations as racial stereotypes. Not so. The modified instruction expressly stated that "both the underlying facts and the inferences drawn from those facts must be established beyond a reasonable doubt."

---

[9]The jury was instructed: "Evidence is either direct or circumstantial. Direct evidence, if found to be true, establishes a fact without the necessity of an inference. Circumstantial evidence, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts. Facts may be proved by direct evidence, by circumstantial evidence, or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. . . . Facts may be established beyond a reasonable doubt by circumstantial evidence. However, in order for the prosecution to sustain its burden of proof by circumstantial evidence, both the underlying facts and the inferences drawn from those facts must be established beyond a reasonable doubt."

Next, defendant contends the trial court erred in instructing the jury on the crime of conspiracy to commit burglary because this charge was not contained in the information. Actually, the trial court did not so instruct.[10] Rather, during Flores's defense, the prosecution stated it intended to proceed on a theory of burglary-murder based on an uncharged conspiracy to commit burglary. The trial court stated it would so instruct, stating the pleadings put the defense "on notice of both a previous intent to burgle and previous intent to rob." The prosecution "charged the robbery in order to be conservative on the theory that there could be a conspiracy to commit robbery without burglary; but if there was a conspiracy hatched before the entry, then it was to do both and, therefore, they cover the ground adequately." Flores, but not defendant, objected below. Defendant now claims he lacked proper notice the prosecutor intended to rely on "felony-murder theories and a burglary in pursuance of a conspiracy." We disagree.

Here, the information charged defendant with three murders, burglary, robbery, the special circumstances that the murders were committed in the commission of a burglary and robbery, and conspiracy to commit robbery. As an overt act in furtherance of the robbery conspiracy, the prosecution alleged defendant entered the Gilhousen residence. " '[I]t is not necessary to separately charge a defendant with either a felony-murder theory or the underlying felony. Felony murder and premeditated murder are not distinct crimes; rather, they constitute "two kinds of first degree murder" requiring different elements of proof.' " (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Here, defendant *was* charged with burglary and the special circumstance of murder in the commission of burglary. Moreover, he was informed during trial that the prosecution intended to proceed on a burglary-murder theory, and the trial court intended to instruct on this theory. (*Id.* at p. 513 [notice adequate when the defendant informed from beginning of trial that prosecution intended to proceed on a theory of rape murder, and trial court indicated willingness to do so if sufficient evidence adduced].) He did not object, and made no request for a continuance on the basis that such notice was inadequate.

[10]The court stated, "If a number of persons conspire together to commit robbery or burglary and if the life of another person is taken by one or more of them in furtherance of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are deemed in law to be equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental. If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons who either directly and actively commit the act constituting such crime or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

(*Ibid.*) Hence, his reliance on *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234 is misplaced. Nor has defendant persuasively demonstrated that his defense strategy was materially affected by the addition of this instruction. (*People v. Davis, supra,* 10 Cal.4th at p. 513.) No error is evident.

Defendant next challenges the trial court's refusal to give his modified instruction regarding defendant's good character. The jury was instructed in the language of CALJIC No. 2.40. Defendant claims this was error because the court's instruction failed to inform the jury what it "should do in response to reasonable doubt based on good character." We disagree. The court instructed the jury that "[g]ood character for the traits involved in the commission of a crime charged, may be sufficient by itself to raise a reasonable doubt as to the guilt of a defendant." The jury had already been instructed that "in case of a reasonable doubt whether [a defendant's] guilt is satisfactorily shown, he is entitled to a verdict of not guilty." There was no need to repeat this principle in the context of the challenged good character instruction. Moreover, we have already rejected defendant's contention that the reasonable doubt instruction was improperly modified.

■ Next, defendant contends the trial court committed reversible error when it misspoke while giving the jury instructions. As defendant acknowledges, misreading instructions is at most harmless error when the written instructions received by the jury are correct. (*People v. Osband* (1996) 13 Cal.4th 622, 687 [55 Cal.Rptr.2d 26, 919 P.2d 640].) That is the case here. Defendant's efforts to distinguish *Osband* are unpersuasive.

Next, defendant contends the trial court erred in refusing to instruct the jury on the lesser related offense of assault with a deadly weapon. Defendant relies on *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]. *Geiger* was overruled in *People v. Birks* (1998) 19 Cal.4th 108, 136 [77 Cal.Rptr.2d 848, 960 P.2d 1073], and that ruling is fully retroactive. (*Ibid.*)

■ Next, defendant contends the trial court erred in instructing the jury that it did not have to unanimously agree on the theory of first degree murder, i.e., felony murder or deliberate and premeditated murder. Not so. Although the elements underlying the theories differ, there is only a single statutory offense of first degree murder. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394 [63 Cal.Rptr.2d 1, 935 P.2d 708].) *Schad v. Arizona* (1991) 501 U.S. 624, 630-631, 645 [111 S.Ct. 2491, 2496-2497, 2504, 115 L.Ed.2d 555], on which defendant relies, does not hold otherwise. Nor is malice an element of felony murder. (*People v. Carpenter, supra,* 15 Cal.4th at p. 394.)

■ Finally, defendant contends that the trial court erred in failing to give an imperfect self-defense instruction. Defendant told police that while

he and Flores waited in the living room for April, Flores suggested they "jack," (i.e., beat) the occupants and steal the marijuana; defendant rejected the idea. Defendant then began assisting Chandler, who was assembling Bryan's tricycle, in the kitchen. Flores entered the kitchen with a baseball bat and attempted to strike Chandler with it. Chandler knocked the bat from Flores's hand, picked up a knife, and came towards defendant. Defendant grabbed the bat, knocked the knife from Chandler's hand, and struck Chandler on the head. Flores then cut Chandler's throat with a box cutter.

Even assuming substantial evidence supported an imperfect self-defense instruction, there was no prejudice. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) The jury necessarily rejected defendant's account when it found the felony-murder special-circumstance allegations true.

### 15. *Alleged Error Regarding Providing Jury Written Transcripts*

During guilt phase deliberations, the jury sent a note requesting the testimony of Randi Renken and Marcus Boykin. The trial judge gave the jury transcripts of this testimony after having the court reporter make certain redactions, and allowing counsel to review the 62-page transcript and make comments. Both the People and defendants requested that the jury be read back the testimony, not given written transcripts. The trial court denied the request. Defendant claims this was error.

Section 1138 provides that "[a]fter the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." We have stated that under this section, "the trial court must satisfy requests by the jury for the rereading of testimony." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1020 [248 Cal.Rptr. 568, 755 P.2d 1017].) We have also held, however, that it is not "improper for a court, with the consent of the accused and his counsel, to provide a transcript to the jury in lieu of rereading testimony in open court." (*People v. Odle* (1988) 45 Cal.3d 386, 407 [247 Cal.Rptr. 137, 754 P.2d 184].) The question here is whether the trial court may do so over the defendant's objection.

"The rereading of testimony is not a critical stage of the proceedings." (*People v. Ayala* (2000) 23 Cal.4th 225, 288 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Hence, the trial court's procedure did not violate defendant's constitutional

right to be present or to counsel at a critical stage of trial. Nor does he persuasively demonstrate his right to a jury trial was violated by this procedure, and he waived below any objection to the procedure based on his right to a public trial.

We also reject defendant's claim the trial court violated a statutory right under section 1138. Section 1138 requires the testimony to be furnished; the form in which it is furnished, i.e., written or oral, is apparently in the trial court's discretion. Even assuming error, defendant does not persuasively demonstrate how he was thereby prejudiced or denied a fair trial. (*People v. Frye* (1998) 18 Cal.4th 894, 1007 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Fauber* (1992) 2 Cal.4th 792, 836-837 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People v. Ainsworth, supra,* 45 Cal.3d at p. 1020.) Rather, it is not reasonably probable that the outcome would have been different had the testimony been reread instead of being provided in writing. (*People v. Ainsworth, supra,* 45 Cal.3d at p. 1020.)

### 16. *Cumulative Error*

Defendant asserts that even if the errors alleged above are not in themselves reversible, they are so cumulatively. We disagree. The few errors that may have occurred during defendant's trial were harmless whether considered individually or collectively. Defendant was entitled to a fair trial, not a perfect one. (*People v. Cain* (1995) 10 Cal.4th 1, 82 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

### B. *Penalty Phase*

### 1. *Prosecutorial Misconduct*

Defendant alleges numerous instances of prosecutorial misconduct and improper questioning by Flores's counsel in violation of his right to due process, a fair trial, an impartial jury, and a reliable death verdict.

Defendant first contends he was prejudiced at the penalty phase by the prosecutor's misconduct during her examination of jail guard Edward Wells in the guilt phase regarding evidence of prior escapes. (See *ante,* at p. 1206.) There was no misconduct at the guilt phase, and hence defendant was not prejudiced at the penalty phase. Indeed, no reference to the alleged escape incident was made at the penalty phase, and the jury was instructed as to the factors it could appropriately consider in determining penalty.

Next, defendant claims he was prejudiced at the penalty phase by improper questions by the prosecutor and Flores's counsel suggesting defendant had threatened witnesses. We have rejected these claims above; hence

defendant was not thereby prejudiced at the penalty phase. (See *ante*, at pp. 1205-1206.)

Next, defendant claims he was prejudiced at the penalty phase by Almond's coerced identification of defendant at the preliminary hearing. There was no misconduct, and hence defendant was not prejudiced thereby at the penalty phase. (See *ante*, at p. 1207.)

Defendant next contends the prosecutor committed misconduct during her penalty phase argument. First, he contends the prosecutor misstated the record when she attributed to Bryan the comment, "Why did you break my mommy's window?" We reject defendant's claim at the outset because he failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to the prosecutor's comment of which he now complains, and no exception is applicable. (*People v. Berryman, supra*, 6 Cal.4th at p. 1072.) We also reject the claim on the merits for the reasons we rejected a similar claim at the guilt phase. (See *ante*, at pp. 1207-1208.)

Defendant next contends that the prosecutor committed misconduct when she stated defendant was the same age as April Gilhousen, and subsequently said, "Defense counsel points to [section 190.3, factor (i)], the age of the defendant at the time of the crime. This is a mitigating factor, if you should so find it. If you find a lack of this mitigating factor, it doesn't come over into the aggravating side, but what I ask you to look at is not the chronological age of Mr. Box, but I ask you to look at the sophistication." The prosecutor then detailed defendant's college attendance, his attention to detail at the Gilhousen residence after the murders were committed, and his similarity in age to those in the military then stationed in Saudi Arabia. Such argument was appropriate. Contrary to defendant's assertion, chronological age is not "all that is relevant to this factor." (*Tuilaepa v. California* (1994) 512 U.S. 967, 977 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750] ["Both the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case."].)

Defendant next contends the prosecutor committed misconduct by arguing defendant's lack of remorse was an aggravating factor. She did not. The prosecutor said, defendant "goes to Jack in the Box soon after committing these murders and he eats. It has not had an effect upon him whatsoever." The prosecutor further noted that defendant went about his everyday business not acting any differently, and fell asleep during a break in his interrogation. These statements were a fair comment on the state of the evidence. "[T]he prosecutor merely anticipated predictable defense argument urging sympathy for defendant and sought to negate its mitigating effect by highlighting defendant's apparent lack of concern for the murder victim[s]."

(*People v. Bemore* (2000) 22 Cal.4th 809, 855 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Defendant next contends the prosecutor committed misconduct when she referred to the fact defendant went to and then returned to the Gilhousen residence, knowing it was Bryan's third birthday. We have already rejected this claim above. (See *ante*, at p. 1202.) No misconduct is evident.

Finally, defendant contends the cumulative effect of the prosecutor's misconduct constitutes reversible error. There was no misconduct.

### 2. *Alleged Instructional Error*

Defendant asserts the jury should have been instructed that the aggravating factors must be proved beyond a reasonable doubt (there was no unadjudicated criminal activity alleged in this case), that to impose the death penalty, the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, and that death must be found to be the appropriate penalty beyond a reasonable doubt. We have consistently rejected these claims. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1059; *People v. Crittenden*, *supra*, 9 Cal.4th at p. 153.) ▆▆▆ Nor does defendant's alternative claim that the trial court erred by not giving the jury any standard of proof have merit. The jury was instructed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." That is sufficient. (*Tuilaepa v. California*, *supra*, 512 U.S. at p. 979 [114 S.Ct. at p. 2638] [jury "need not be instructed how to weigh any particular fact in the capital sentencing decision"]; *People v. Davenport*, *supra*, 11 Cal.4th at p. 1231.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Nor, contrary to defendant's assertion, did the trial court err in failing to instruct the jury that it must unanimously agree that a particular aggravating circumstance exists. (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 153.)

Defendant next contends it was error not to instruct the jury to refrain from drawing any inference from the fact that defendant did not testify at the penalty phase. Not so. (*People v. Davenport*, *supra*, 11 Cal.4th at p. 1231.)

Defendant also contends the jury should have been instructed that it could not consider as an aggravating factor any aspect of defendant's crimes that

were elements of first degree murder. In particular, he contends that the trial court should have informed the jury of the definition of an "aggravating circumstance" contained in *People v. Dyer* (1988) 45 Cal.3d 26, 77 [246 Cal.Rptr. 209, 753 P.2d 1]. In fact, the trial court did so.

### 3. *Alleged Unconstitutionality of Death Sentencing Statute and Process*

Defendant contends the California death statute is unconstitutional in numerous respects. We have previously rejected all of these arguments, and defendant cites no compelling reason to reconsider our decisions. Thus, the California death statute is not unconstitutional in failing to require the jury to make explicit findings of the factors it finds in aggravation and mitigation (*People v. Davenport, supra,* 11 Cal.4th at p. 1232), require intercase or intracase proportionality review (*People v. Jenkins* (2000) 22 Cal.4th 900, 1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Turner, supra,* 8 Cal.4th at p. 209), delete inapplicable factors (*People v. Turner, supra,* 8 Cal.4th at pp. 207-208), identify which factors are aggravating and which are mitigating (*People v. Crittenden, supra,* 9 Cal.4th at p. 153), require that aggravating factors be proven beyond a reasonable doubt, require that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt, require that death must be found to be the appropriate penalty beyond a reasonable doubt (*ibid.*), or require that there be any burden of proof (*People v. Hawthorne, supra,* 4 Cal.4th at p. 79). Nor are the factors a jury may consider in determining penalty, such as the circumstances of the crime, the defendant's age, or the use of the adjectives "extreme" and "substantial," unconstitutionally vague. (*Tuilaepa v. California, supra,* 512 U.S. at pp. 976-977 [114 S.Ct. at pp. 2637-2638]; *People v. Turner, supra,* 8 Cal.4th at p. 208.) Nor does the prosecutorial discretion to charge special circumstances or seek the death penalty under the statute violate the federal Constitution. (*People v. Williams* (1997) 16 Cal.4th 153, 278 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Crittenden, supra,* 9 Cal.4th at p. 152.) Nor does the death statute in general, or the multiple-murder special circumstance in particular, fail to narrow in a constitutionally acceptable manner the class of persons eligible for the death penalty. (See generally *People v. Smithey* (1999) 20 Cal.4th 936, 1017 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Crittenden, supra,* 9 Cal.4th at pp. 154-156.)

 Contrary to defendant's assertion, use of unadjudicated criminal activity during the penalty phase is permissible; however, no such evidence was introduced in this case. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1054; *People v. Turner, supra,* 8 Cal.4th at p. 209.) While there was evidence at the guilt phase regarding defendant's drug use and dealing, the jury was instructed at the penalty phase that, aside from the crimes defendant was

convicted of in the guilt phase, it could only consider "criminal activity . . . which involve[d] the use or attempted use of force or violence or the express or implied threat to use force or violence," and that it could "not consider any evidence of any other criminal activity as an aggravating circumstance." "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

### 4. *Alleged Impermissible Race Factors*

■ Defendant contends that impermissible race factors affected the prosecutor's decision to seek and the jury's imposition of the death penalty, in violation of his right to due process under the Fifth and Fourteenth Amendments, a fair trial under the Sixth Amendment, a reliable verdict under the Eighth Amendment, and to equal protection of the laws under the Fourteenth Amendment. He relies on the facts that he is Black, Flores is Hispanic, and the murder victims were White, the county in which the trial took place is predominantly White, the prosecutor exercised her peremptory challenges to excuse Black prospective jurors, and the fact that he was the only defendant against whom the death penalty was sought. Defendant also contends the prosecutor used race as a factor even though race was not mentioned when she described her theory of how defendant murdered Bryan during her penalty phase argument.

We reject defendant's constitutional challenges because none of these factors demonstrate, directly or circumstantially, that race was a factor in either the prosecutor's decision to seek, or the jury's decision to impose, the death penalty. (*People v. Keenan* (1988) 46 Cal.3d 478, 506 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People v. Melton* (1988) 44 Cal.3d 713, 772 [244 Cal.Rptr. 867, 750 P.2d 741].) Defendant does not argue the evidence against him was insufficient; nor do we so find. Nor did he seek below to change venue, and we have already rejected defendant's claim that the prosecutor impermissibly exercised her peremptory challenges to exclude Blacks from the jury. (See *ante*, at pp. 1185-1190.) Moreover, Flores was statutorily ineligible for the death penalty because of his minority at the time of the crimes. Prospective jurors were voir dired on the issue of racial bias, and defendant's sentence was imposed under procedures that focused the jury's discretion on the particularized characteristics of this individual defendant and the circumstances of the crime. Contrary to defendant's assertion, allowing the jury to consider the circumstances of the crime does not mean "there is a strong likelihood that racial prejudice . . . infected the [jurors'] deliberations." "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that

the discretion has been abused." (*McCleskey v. Kemp* (1987) 481 U.S. 279, 297 [107 S.Ct. 1756, 1770, 95 L.Ed.2d 262].) Defendant has failed to make such a compelling showing here.

### 5. *Cumulative Error*

Defendant contends cumulative and interrelated errors from the guilt and penalty phases undermined the fundamental fairness of his penalty trial and mandate reversal. We have found no errors that can be deemed cumulatively prejudicial.

### 6. *Denial of Automatic Motion to Modify*

Defendant contends the trial court committed various errors in denying the automatic motion to modify the death verdict. (§ 190.4, subd. (e).) None of these claims have merit.

First, defendant claims that the trial court erred in disregarding the fact that Flores, who was found guilty of the same crimes, could not receive the death penalty. "However, the punishment received by others who might be involved in the crime is not relevant to [any] 'intracase' proportionality review, because a capital penalty determination is 'based on the character and record of the individual defendant and the circumstances of the offense.'" (*People v. Arias, supra*, 13 Cal.4th at p. 193, italics omitted.)

Defendant next contends that the trial court gave excessive weight to the circumstances of the crime, and insufficient weight to the mitigating evidence, such as his apparent lack of planning and lack of any prior convictions or unadjudicated violent conduct. Along these lines, defendant similarly contends the trial court failed to properly weigh evidence under section 190.3, factor (k), which, as expanded upon in *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], allows consideration of " 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Id.* at p. 878, fn. 10.) In particular, defendant contends that "[s]ince the events were uncharacteristic of [defendant's] prior behavior, his good background should not be diminished."

The trial judge, however, did note that defendant's youth and "excellent, outstanding record in life" were mitigating factors; he simply concluded that the circumstances of the crime, particularly defendant's callousness and the presence of three special circumstances, significantly outweighed this evidence. Nor need the trial court recite all possible mitigating evidence.

(*People v. Arias, supra,* 13 Cal.4th at p. 192; *People v. Memro* (1995) 11 Cal.4th 786, 885 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

Defendant further contends the trial court erroneously characterized defendant based on evidence not in the record. Not so. The trial court's references to defendant's use and possible selling of methamphetamine, his involvement in a deal to purchase marijuana from April, and his association with Flores, were based on the record, and supported the trial court's statement, "Defendant's good record—oh, I could cry with all those people who came in and testified, who have been inspired by Chris Box . . . But the problem is that they did not know the whole story, and the whole story was changing. . . . In short, this ideal record is not the whole picture. Even before the start of the events that give rise to this case, Chris Box was on the skids, and he just went off an awfully big bank all at once." Defendant also objects to the trial court's statement that "I'm inclined to think that what happened was that Chris Box was forced within the last year before this offense to come to terms with the fact—to make adjustments to the fact that life is not fair, and most particularly it was not fair to him. And that's mitigating that it wasn't fair. And it wasn't. Here he was; he did all the right things; he touched all the right bases; and he should have gone ever onward and upward. And God didn't make him four inches taller, and so it wasn't happening. And he put all his eggs in that basket and couldn't see any other basket. And, unfortunately, his reaction was in the direction of 'Life isn't fair to me, so why do I have to be fair to it.'" The trial court did not engage in improper speculation, as defendant suggests, but relied on reasonable inferences from the evidence, such as defendant's disappointment in not receiving a college football scholarship, and testimony that his height was the most likely reason for this lack of opportunity.

Finally, defendant contends that the cumulative effect of the trial court's errors in ruling on the automatic motion to modify requires reversal. There was no error.

### 7. *Jury Misconduct Allegation*

 Defendant contends the trial court erred in denying defendant's motion for new trial based on alleged jury misconduct, failing to adequately investigate the allegation, and denying defendant's request for the jurors' addresses and telephone numbers. None of these claims have merit.

On December 18, 1990, the jury returned a verdict of death. On December 20, 1990, Deputy Clerk Laura Clark was questioned on the record by Judge

Peterson[11] regarding a jury room conversation she had overheard. According to Clark, on Monday, December 17, 1990, she was using a copy machine located in a foyer adjacent to the room in which defendant's jury was deliberating. She heard two voices, a male and female. The male voice said, "The newspaper said that he could get 27 years to life for each count and that there are seven counts." The female voice responded, "Yes, that's what the newspaper said." At this point, Clark left the foyer.

The following day a reporter's transcript of Clark's statement was given to the parties. On January 4, 1991, defendant filed points and authorities in support of a new trial motion based on Clark's statement, and the prosecutor submitted copies of news stories about the case that had appeared in local newspapers between the time of the guilt verdict on December 7, 1990, and the penalty verdict on December 18, 1990. That same day, a hearing was held in which the matter was further discussed. The prosecutor noted that none of the articles referred to "27 years to life." Counsel knew the jurors' names; their request for the jurors' addresses was denied in the absence of a motion and sufficient showing. Defense counsel also requested that the court conduct its own investigation. That request was denied. The court stated, "I'm telling you that what is before me is insufficient to induce me to take any action whatever. If you're going [to] move me, you're going to have to have more." Counsel also made an oral new trial motion, and requested that the court defer ruling "until we have done further investigation." The trial court did so.

On January 18, 1991, further proceedings were held. Defense counsel indicated that they were continuing to investigate the matter, but had recently been denied funding for an investigator, and had conclusively located only some of the jurors in the telephone book. Other jurors' names appeared in the telephone book in duplicate, and counsel had apparently not attempted to ascertain whether any of the names were of the actual jurors. Defense counsel renewed their request for the jurors' addresses and telephone numbers. The trial court denied the request, stating that it had reviewed the known newspaper articles and saw nothing either prejudicial or that suggested investigation would find anything prejudicial. "I decline on the present showing to release anything." "[I]t's incumbent on somebody to find something that somebody said that said '27 to life.' Now, if you come in with that, then I'll infer that that's probably what they heard; and if it's prejudicial, then you've got the lead that you're talking about. And you have to find out did they really hear that, and if they really heard that and it really is prejudicial, then I would have to grant the motion for new trial on the

---

[11]Clark also approached Judge Langford, the trial judge in this case. Because of his concern he might become a witness, Judge Langford asked Judge Peterson to question Clark.

penalty phase. But . . . giving it the worst for the jury, they say they read newspapers. . . . My recollection of the transcript was somebody said that 'the newspaper said' and somebody else said, 'That's what it said,' and they said '27 to life.' Now, none of those things in my view could or would in any way prejudice the defendant's right to a fair determination of penalty. And as long as that is true, . . . if I do anything, I will then be lending credence to something other than that. And since I don't believe in harassing juries without, shall we say, probable cause, whatever the standard may be, I am loath to make such an order because it creates a risk with regard to what I believe the showing so far has been, and it also opens the door a little further to jury harassment."

The sentencing hearing, which coincidentally had also been scheduled for January 18, was continued to February 22, with the understanding defense counsel had the option of continuing to investigate the jury misconduct allegations. At the February 22, 1991, hearing, the jury misconduct allegations were not discussed.

Defendant never filed a written motion for new trial or sought a ruling on his oral motion for new trial; hence the trial court could not deny such a motion or err in doing so.

Nor did the trial court err in failing to hold an evidentiary hearing on the allegations of juror misconduct. Such a hearing need only be held when " 'the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.' " (*People v. Jones* (1997) 15 Cal.4th 119, 195 [61 Cal.Rptr.2d 386, 931 P.2d 960], overruled on other grounds in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) That was not the case here. Clark's statement was hearsay; she was unable to even identify which jurors were speaking. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1257 [91 Cal.Rptr.2d 211, 989 P.2d 645].) Moreover, the overheard comments were ambiguous as to who potentially might receive the 27-year-to-life sentence, and may have involved an entirely unrelated case. Indeed, the known newspaper articles during the relevant time period did not contain the phrase "27 years to life." Finally, even if the comments were about Flores, it is difficult to see how such a conversation prejudiced defendant. Counsel was given the opportunity on January 18, 1991, to continue its investigation; for reasons not in the record, it apparently abandoned this effort.

Nor did the trial court err in declining to provide the jurors' addresses and telephone numbers. This case was tried in 1990, prior to the enactment of Code of Civil Procedure section 237. At that time, defense counsel was

entitled to jurors' addresses and telephone numbers "if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552 [261 Cal.Rptr. 1], cited with approval in *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1093-1094 [86 Cal.Rptr.2d 602, 979 P.2d 963].) Here, prior to January 18, defense counsel did not contact those jurors whose addresses and telephone numbers they had independently obtained, or attempt to ascertain whether identical names in the telephone book were those of jurors. Moreover, for the reasons that the trial court was not required to hold an evidentiary hearing, the trial court expressly and reasonably found nothing either prejudicial or that suggested investigation would find anything prejudicial. The court acted within its discretion in denying the request.

## DISPOSITION

The judgment is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

Appellant's petition for a rehearing was denied October 3, 2000.